## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

JACKSON YOUNG BROOKS

    *Plaintiff,*

    v.

QUILITY INSURANCE HOLDINGS, LLC,
SYMMETRY FINANCIAL GROUP, LLC,
QUILITY FINANCIAL ADVISORS, LLC,
MATTHEW GOFORTH,
MICHAEL RESMA,
BRIAN WILLIAMSON,
LISA KIMBRELL,
CHRIS LEAKE,
CRAIG MCMANAMON,
SIERRA SMITH-SIMONDS,
JEFF SIGWORTH,
TIM TAYLOR SMITH.


    *Defendants.*

FILED
ASHEVILLE, NC



MAR 1 0 2026

U.S. DISTRICT COURT
W. DISTRICT OF N.C.

**COMPLAINT**

Case No. 1:26-cv-75-MR-WCM

1

Plaintiff for his Complaint against Quility Insurance Holdings, LLC, Symmetry Financial Group, LLC, Quility Financial Advisors, LLC, Matthew Goforth, Michael Resma, Brian Williamson, Lisa Kimbrell, Chris Leake, Craig McManamon, Sierra Smith-Simonds, Jeff Sigworth, and Tim Taylor Smith (collectively, the "Defendants") shows the following:

## PRELIMINARY STATEMENT

1.      This case challenges a nationwide insurance distribution network that generated revenue by Defendants' operation and management of a deceptive mortgage protection consumer solicitation regime that misleads consumers through mortgage-referenced solicitations, monetizing those responses as leads, and selling those leads to insurance agents while retaining centralized control over every meaningful aspect of the agents' ability to work and earn income. Defendants induced prospective agents like Plaintiff into their network, and designed the system so that profit flowed upward regardless of whether consumers received what was promised or agents earned a living, and they deployed it uniformly across states, agents, and consumers.

2.      Plaintiff was one of many mortgage protection insurance agents recruited through interstate representations that he would operate an independent business and own his book of business, yet that independence never existed. Defendants dictated how agents solicited consumers, which products and carriers could be accessed, how commissions were routed, and whether an agent could continue operating at all. All essential activity was required to run through Defendants' proprietary platforms, ensuring that agents remained economically dependent on the system they paid to participate in.

3.      Plaintiff raised good faith concerns about deceptive and unlawful conduct embedded in Defendants' consumer sales operations. Defendants did not correct the misconduct.

2

Instead, they coordinated pressure, concealment, harassment, and enforcement to suppress him while continuing to deploy the same practices against other agents and consumers.

4.     When Plaintiff blew the whistle, Defendants conspired to make an example of him. Defendants removed Plaintiff by issuing him a letter from counsel that locked him out of all platforms, stripped his carrier appointments, deprived him of purchased data and business records, and falsely portrayed his removal to state regulators as voluntary and non-retaliatory. These actions destroyed Plaintiff's livelihood and were undertaken to silence reporting and protect a revenue model that depends on deception, control, and retaliation, not just against Plaintiff, but as a regular way of doing business.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

6.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

7.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and b(3) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

8.     Plaintiff Jackson Young Brooks ("Plaintiff")  is a citizen and resident of Louisiana. Plaintiff obtained his insurance license on February 13, 2025. Plaintiff was a mortgage protection insurance agent contracted with Symmetry Financial Group, LLC, and Quility Insurance Holdings, LLC, until July 15, 2025.

3

## *Defendants*

9.      Defendant Quility Insurance Holdings, LLC ("Quility") maintains its principal

office at 204 Whitson Avenue, Swannanoa, North Carolina 28778. Quility was the corporate

authority of Symmetry Financial Group, LLC, Quility Financial Advisors, LLC, and other

affiliated entities. Quility is an insurance sales and marketing entity. Quility provided executive

leadership, corporate staff, marketing, branding, contracting, proprietary products, technology

platforms, supervision, and business direction that governed Plaintiff, affiliated entities, and

agency hierarchies. Quility conducts business from North Carolina and within many other states.

10.     Defendant Symmetry Financial Group, LLC ("Symmetry") maintains its principal

office at 204 Whitson Avenue, Swannanoa, North Carolina 28778. Symmetry was the primary

agent-facing arm of the insurance sales and marketing network powered by Quility. Symmetry

leadership consisted of individuals within agency hierarchies titled as agency owners, agency

directors, equity partners etc., and were arranged in a multi-level fashion. Symmetry leadership

was central in the onboarding and training of Plaintiff and other insurance agents.

11.     Defendant Quility Financial Advisors, LLC ("QFA") is headquartered in

Rockledge, Florida. QFA functioned as the advanced markets conduit and United States

Securities and Exchange Commission ("SEC")-registered investment adviser affiliated with

Quility. QFA was integrated into Symmetry's and Quility's advanced market workflows, agent

pipelines, and other client-facing activities.

12.     Defendant Matthew Goforth ("Goforth") is an individual who served as general

counsel, legal officer, and secretary for Quility and Symmetry.

4

13.     Defendant Michael Resma ("Resma") is an individual who served as chief distribution officer and vice president for Quility and Symmetry. Resma had executive authority over company communications, distribution strategies, agency hierarchies, and production oversight.

14.     Defendant Brian Williamson ("Williamson") is an individual who served as chief leadership development officer for Quility and Symmetry. Williamson had executive authority in leadership activities, company communications, agency oversight, and agency owner behavioral training.

15.     Defendant Chris Leake ("Leake") is an individual and agency director affiliated with Symmetry who served as the mortgage protection national sales director. Leake disseminated mortgage protection insurance sales training to Symmetry agents, including Plaintiff.

16.     Defendant Tim Taylor Smith ("Tim Smith") is an individual associated with Symmetry, Quility, and QFA. Tim Smith was a QFA investment adviser representative ("IAR"), fiduciary, and Symmetry subject matter expert ("SME"). Tim Smith was authorized by Defendants to interact with agents and consumers as part of advanced markets or "reset" activity. Tim Smith operated under Leake's supervision.

17.     Defendant Craig McManamon ("McManamon") is an individual and agency director affiliated with Symmetry who served as agency director for McManamon's hierarchy of agents. McManamon enforced Quility and Symmetry policies, onboarded, supervised, and managed Plaintiff and downstream agencies and agents, led weekly calls, and operated under Leake's supervision.

5

18.     Defendant Sierra Smith-Simonds ("Smith-Simonds") is an individual and agency owner affiliated with Symmetry who served as agency owner for Smith-Simonds' hierarchy of agents. Smith-Simonds enforced Symmetry and Quility policies, supervised and managed Plaintiff and other agents, led weekly calls, and operated under McManamon's supervision.

19.     Defendant Lisa Kimbrell ("Kimbrell") is an individual and master agency owner who served as an equity partner affiliated with Quility and Symmetry. Kimbrell co-led weekly calls with her husband and supervised the 'Kimbrell Master Agency,' encompassing the Leake, McManamon, and Smith-Simonds agencies, among others.

20.     Defendant Jeff Sigworth ("Sigworth") is an individual and corporate officer who served as Quility's head of advanced markets. Sigworth had executive authority over advanced markets operations along with management and oversight of Symmetry SMEs and QFA IARs.

### *Associated Entities*

21.     Stephen Walsh ("Walsh") is an individual and associated person who was Plaintiff's hiring manager and upline manager acting under Smith-Simonds and McManamon. Upon information and belief, Walsh is no longer affiliated with Symmetry or Quility.

22.     Danny Young is an individual and managing partner affiliated with Quility and Symmetry. Danny Young is a top agency director, and his agency encompasses the Kimbrell master hierarchy. Danny Young hosted recurring Sunday night interstate conference calls that directed Plaintiff and other agents.

23.     Brandon Ellison, Casey Watkins, Brian Pope, and Meredith Ellison (the "founders") are individuals and associated persons who created Symmetry in 2009 and formed Quility in 2020. Each directly exercised ownership-level authority over internal structure, governance, and strategic direction over Defendants' commercial operations and internal culture.

6

24.     Other unknown associated entities relevant to this action likely exist, and those entities will be ascertained upon commencement of discovery.

## FACTS

### I.     Platforms and Infrastructure

25.     Defendant Quility provided corporate oversight to Defendant Symmetry. These entities, along with QFA, operated a nationwide sales and marketing platform that primarily served as a commercial insurance distribution network through which insurance agents were onboarded, contracted, trained, and supervised.

26.     Quility classified Symmetry agents, such as Plaintiff, as independent contractors and were referred to internally as mortgage protection agents, field underwriters, writers, or insurance agents. Quility or Symmetry did not provide its agents with wages or salaries.

27.     Defendants determined the manner and means by which insurance agents obtained and solicited consumers, what products could be sold, which carriers could be accessed, how sales were conducted, how commissions flowed, what business agents could conduct, and whether an agent could continue operating at all through Defendants' infrastructure and proprietary digital platforms.

28.     Defendants designed a series of business systems so that agents could "do everything under one roof," and with that came the agent's inability to function outside of Defendants' proprietary platforms and sales systems once onboarded.

29.     Plaintiff and other agents were required to conduct all business activity through Defendant-controlled proprietary digital platforms and systems referred to as Quility's HQ ("HQ") and Opt customer relationship management ("Opt CRM" or "Opt"). Access to these systems was mandatory and they were used for all essential aspects of agents' activity such as

7

reporting submitted business, agency and policy tracking, licensing and contracting infrastructure, client data access, training materials and modules, and advanced markets routing pipelines.

30.     Without platform or carrier access, an agent could not receive or retrieve leads, contact consumers, submit applications, service policies, receive commissions, or access business data and records. Symmetry leadership, including agency owners along with Quility corporate officers and staff retained unilateral authority to grant, restrict, suspend, or terminate access to digital systems (HQ, Opt, etc.) at any time.

31.     At all relevant times, Defendants enforced their control via multi-level agency hierarchies, interstate communications, virtual meetings, and proprietary digital platforms. Each individual Defendant was involved in the operations and management of Defendants' activities and served as agency owners, regional directors, equity partners, corporate officers, SMEs, and other executive titles or personnel directing and conducting business activity from or affiliated with the North Carolina-based Quility and Symmetry entities and headquarters.

32.     Defendants, together with associated corporate staff, agency owners, upline managers, and administrative staff, monitored Symmetry agent production; operated corporate departments that contacted clients on policies previously written by Symmetry agents; led daily and weekly recurring meetings and training sessions; enforced mortgage protection sales practices; marketed the Symmetry opportunity to prospective new agents; and managed the day-to-day operations of Symmetry agents upon onboarding.

33.     Advancement, support, and continued participation were conditioned on Defendants' directives and policies, and Symmetry agents had to remain in 'good standing with corporate' to continue working and earn income.

8

34.     Defendants' infrastructure was designed to lock agents into Defendants' distribution channels by controlling the agent's access to leads and consumer contact information, carrier appointments and contracting, compensation structures and commission routing, and client data and policy servicing tools housed in Defendants' proprietary platforms.

35.     Defendants retained control over the underlying platforms vital to agent activity such as consumer contact information, business tracking, policy management, and the carrier/commission routing relationships required to service clients, access policies, or earn income.

36.     Defendants claimed to offer former and prospective agents, such as Plaintiff, an opportunity to build their own business, yet agents' access to purchased leads and carrier contracts was revoked upon departure. Defendants continuously omitted that true ownership or advancement was conditioned on achieving "agency owner" status and by meeting certain production and recruiting thresholds determined by company policy and enforced by Defendants in leadership and executive authority.

37.     This infrastructure was common across thousands of insurance agents and used as a gatekeeping mechanism for meaningful business autonomy. Agents who did not achieve Defendants' defined production and recruiting thresholds remained dependent on Defendants' hierarchies and platforms for carriers, contracting, existing business, policy management, and lead access, and could not operate as an independent insurance business outside Defendants' system.

38.     Plaintiff and similarly situated agents were initially induced by and conditioned to believe that they were operating as independent business owners by Defendants, yet were denied the ability to professionally part ways and were constrained from leaving without forfeiting the

9

practical ability to continue the same line of work with the same customers and prior purchased leads and carrier access.

39.     Upon departure or termination, Plaintiff and other agents were locked out from platforms controlled by Defendants and were often executed by leadership without notice.

40.     Plaintiff contends that Defendants controlled the manner and means by which agents performed their work while extracting substantial revenue from agent labor and lead expenditures for an indefinite amount of time.

## II.     Business Identity and Purpose

41.     Symmetry was formed as a mortgage protection sales company and designed their insurance distribution model to target mortgaged consumers nationwide primarily via the U.S. mails, along with digital advertising, telemarketing, and other interstate solicitation methods.

42.     Since Symmetry's founding in October 2009, Defendants' business identity, growth strategy, purpose, and revenue model have been built around mortgage protection insurance solicitation as the primary consumer-acquisition and revenue channel.

43.     Mortgage protection insurance solicitation is the commercialized insurance concept through which Symmetry has generated revenue, consumer demand, and scaled production with acquired clients.

44.     In a publicly available video entitled "Symmetry Financial Group Corporate Overview 2023," published on Symmetry's YouTube channel, Symmetry founder Casey Watkins stated in substance that Symmetry was founded "on the back of the biggest mortgage crisis."

45.     In the same and related publicly available materials, Symmetry founder Brandon Ellison represented that Defendants operate as a "lead-generating company" that does not seek to profit from selling leads themselves, but instead generate revenue by "selling insurance" and "protecting families."

10

46.     In another publicly available corporate overview video on Symmetry's Youtube channel, Symmetry founder Brian Pope stated that what Defendants do is "head and shoulders above anybody else," regarding their mortgage protection-centered model as the defining and differentiated core of the organization compared to other competing insurance marketing organizations ("IMOs").

47.     Defendants and their leadership staff communicated uniform new agent and recruiting representations and established standardized training systems that funneled new agents into mortgage protection insurance as their entry point and the foundational product line and concept upon which new Symmetry agents, such as Plaintiff, were expected to build production.

48.     Plaintiff and similarly situated agents were directed to prioritize pervasive and deceptive mortgage protection sales practices, follow leadership-approved sales frameworks, and treat mortgage protection as the principal path to production, advancement, and recognition within Defendants' system.

49.     Defendants required Plaintiff and other agents to contract with a defined group of insurance carriers internally referred to as the "core carriers." These carriers were: (1) Mutual of Omaha; (2) American General Life Insurance Company/Corebridge Financial; (3) Americo Financial Life and Annuity Company ("Americo"); (4) American Amicable Group; (5) Savings Bank Mutual Life Insurance Company ("SBLI"); (6) United Home Life; (7) Legal & General America/Banner Life; (8) Foresters Financial; and (9) Fidelity & Guaranty Life Insurance Company ("F&G").

50.     Defendants represented that these carriers were selected and maintained based on corporate carrier relationships and agent handbook policies, underwriting speed, simplified issue

11

processes, and suitability for mortgage protection sales to consumers responding to Defendants' lead generation or consumer solicitation funnels.

51.     Defendants and Symmetry agents marketed and distributed multiple proprietary or Quility-branded insurance products to consumers, including SBLI EasyTrak Digital Term; SBLI Quility Level Term; American Amicable Quility Secure Future Preferred; United Home Life Quility Secure Future Complete; Legal & General Quility Term Plus; and Foresters Financial Debt Free Life.

52.     Plaintiff and other agents were trained by Defendant Leake, Symmetry leadership, and Quility corporate staff and training modules on how to use Quility's digital platforms to service consumers, how to solicit mortgage protection and follow approved product hierarchies when presenting coverage to consumers, and how to prioritize Defendants' mortgage protection concept, endorsed carriers, and branded products over alternative market options.

53.     Symmetry and Quility leadership, including Defendants Leake, McManamon, and Smith-Simonds, instructed agents that deviation from these approved product hierarchies and Leake's mortgage protection sales and consumer dialing methods was discouraged and could negatively affect income and advancement.

54.     Through a common purpose of expanding their sales force and funneling new agents into standardized proprietary platforms, centralized carrier contracting, marketing of proprietary products, uniform telemarketing sales practices and mortgage protection training, internal advancement criteria and leadership directives, established mortgage protection lead generation practices, branded infrastructure, and corporate-determined commission schedules, Defendants enforced and applied these systems across thousands of agents nationwide.

12

55. Defendants' mortgage protection business was not merely the sale of third-party insurance products, but a highly standardized, leadership-directed system built upon Symmetry and Quility's selected carriers, branded products, digital platforms, and approved sales pathways.

56. The deceptive mortgage protection insurance sales and lead practices, platform-based controls, new agent onboarding representations, carrier contracting, and other actions complained of herein were conceived, directed, implemented, and executed from North Carolina, through Symmetry and Quility's North Carolina-based headquarters, employed and carried out by Defendants, the founders, corporate staff, and other management personnel through its proprietary digital platforms and virtual agency and national leadership-led meetings, and these operations were deployed nationwide as part of Defendants' ordinary course of trade or commerce.

III. **Insurance Marketing and Sales Operations**

57. From at least 2009 through the present, Defendants implemented and carried forth a nationwide marketing and sales program for mortgage protection insurance that disseminated representations and solicitations on the internet and via the U.S. mails conveying bank and lender-affiliated urgency and mortgage payoff promises, while steering consumers into ordinary life insurance policies that did not guarantee mortgage payoff.

58. As part of their regular marketing practices, Defendants, including Symmetry and Quility, caused mortgage protection mailers to be designed, approved, and mailed to mortgaged consumers nationwide whose information had been obtained through public county database records.

59. On June 8, 2016, the Illinois Department of Financial and Professional Regulation, Division of Banking, issued an Order to Cease and Desist against Defendant

Symmetry finding that Symmetry had sent mortgage life insurance marketing and solicitations to customers of Pan American Bank using the bank's name without the bank's consent, in violation of Section 46(d)(1) of the Illinois Banking Act.

60. The order found that Symmetry's use of the bank's name caused customer confusion and complaints alleging that the bank had furnished confidential information to outside parties, despite the bank denying any authorization for Symmetry's conduct. The Illinois regulator ordered Symmetry to immediately cease using the name of any bank in its marketing materials absent express permission and warned that each individual mailing could constitute a separate violation subject to civil penalties of up to $10,000 per instance.

61. These mailers and solicitations were intended to induce consumers to believe that the solicitation was connected to their bank, mortgage lender, or loan obligation and that the insurance product offered would protect, satisfy, or eliminate the mortgage loan.

62. The representations contained in and implied by these mailers were materially false and misleading. The insurance policies sold through Defendants' systems were ordinary life insurance policies that did not guarantee mortgage payoff, were not assigned to mortgage lenders or banks, did not name lenders as beneficiaries, and did not function as mortgage debt-satisfaction instruments.

63. Defendants' mortgage protection mailers included phrases such as "final mortgage notice," "pays off your mortgage," or "mortgage protection plan," without disclosing that the policies sold did not guarantee mortgage satisfaction, were not assigned to lenders, and did not function as mortgage debt payoff instruments.

64. Defendants knew that consumers reasonably interpreted the mailers as mortgage debt protection rather than generic life insurance, and Defendants trained Symmetry agents to

14

reinforce this interpretation through telemarketing solicitations and mortgage protection sales presentations.

65. The mailers were material to consumers' purchasing decisions, were transmitted for the purpose of executing and furthering the scheme, and resulted in consumers providing medical/health information and other personally identifiable information (bank account numbers, social security numbers, etc.), and then purchasing insurance products under false pretenses, thereby generating significant amounts of leads, commissions, overrides, and revenue for Defendants' sales and marketing operations.

66. These mailings utilized bank or lender-affiliated formatting, mortgage debt language, and urgency cues, and materially misrepresented and omitted facts concerning the nature, scope, and limitations of the insurance products being marketed. The mailings were designed to induce reasonable consumers to respond under the false belief that the coverage was required, bank or lender-connected, or directly tied to mortgage obligations.

67. Defendants' mortgage protection-centered business model generated substantial revenue growth over time and has functioned as the primary method for the acquisition of consumers and leads within their marketing network. Defendants represented that these marketing systems produced roughly ten to fifteen thousand mortgage protection leads per week.

68. Since the 2016 Illinois Cease and Desist Order, Symmetry and Quility's revenue has expanded. In publicly available videos, Defendants have reported annualized premium volume ("APV") reflecting uninterrupted year-over-year growth from approximately $3 million of APV in 2010 to over $240 million APV generated in 2025.

69. Defendants' standardized training systems, agent-facing materials, and leadership communications for mortgage protection insurance constituted the dominant product category

15

driving this production growth. Agent good standing, APV, and new recruits served as the principal metrics by which Plaintiff and similarly situated agents were evaluated, ranked, advanced, and recognized.

70. Quility, QFA, and Symmetry targeted middle-class American families with a mortgage or home equity loan. Symmetry agents performed mortgage protection solicitations as the consumer entry point and referred their leads and consumers to Symmetry SMEs and QFA IARs for advanced markets solicitations.

71. Defendants' business model was designed to funnel the leads/consumers through the financial suite of products that Defendants' had to offer such as mortgage protection, term life, whole life, and advanced markets strategies and financial services (e.g., infinite banking, debt elimination etc.) solicited to consumers by Symmetry agents, SMEs, and QFA IARs.

72. Mortgage protection policies marketed and sold through Defendants' systems were pitched to consumers by Symmetry agents as life insurance death benefits aligned with consumers' outstanding mortgage balances or portions thereof. Individual policy face amounts commonly ranged from tens of thousands up to two million dollars.

73. Through leadership presentations and corporate revenue charts, Defendants represented that, as of approximately May 2024, the mortgage protection platform had generated upwards of $1.2 billion in cumulative APV and over $82 billion in aggregate policy face amount since 2009.

## IV. New Agent Onboarding Systems

74. Defendants used uniform sales puffery and marketing representations to induce prospective agents, including Plaintiff, to join Defendants' enterprise by falsely representing that agents would operate independent insurance businesses with broad market access,

16

entrepreneurial autonomy, and access to 30+ or 50+ top-rated insurance carriers, which were disseminated through interstate communications, including corporate overview videos, job postings, social media, and other digital platforms and word-of-mouth regurgitations.

75.     Plaintiff was directed to watch corporate overview videos disseminated by Symmetry leadership prior to his "interview with a hiring manager" with Walsh and new agent "meet and greet" with Defendant Smith-Simonds. In these videos, Defendant McManamon's representations were material to Plaintiff and other prospective agents' decisions and were designed to induce trust in Defendants' distribution and onboarding systems.

76.     At all relevant times, Symmetry and Quility leadership, including Defendants McManamon, Leake, and Smith-Simonds, transmitted materially false and misleading new agent acquiring statements through interstate wires, including job listings, social media channels, emails, digital onboarding portals, recorded recruiting videos, Zoom meetings, telephone calls, and other electronic communications disseminated nationwide and were designed to induce prospective agent participation. Plaintiff and other prospective agents were captured through self-scheduling intake funnels using online job advertisement platforms (on LinkedIn, Craigslist etc.) and by word-of-mouth representations portraying it as a job opportunity offering remote flexibility, ownership, and uncapped income potential.

77.     Defendants McManamon and Smith-Simonds represented that Plaintiff would control his schedule, have access to over thirty carriers, and operate as an independent business owner rather than as a controlled telemarketing sales participant within Defendants' organization.

78.     These onboarding representations were false. Plaintiff was induced by these representations prior to executing the independent contractor agreement. Plaintiff and other newly onboarded agents were restricted to the subset of predetermined core carriers selected by

17

Defendants, lacked authority to select or negotiate carrier access, and were subject to centralized supervision, imposition of advancement criteria, lead dependency, and platform control upon onboarding with Symmetry and Quility.

79.     Defendants likely knew these representations were false at the times they were made and transmitted them to induce agents to initially contract with Defendants and subsequently invest money, lead expenditures, and labor into Defendants' platforms and systems. These wire communications were material to Plaintiff's decision to join and participate and were transmitted for the purpose of executing and furthering Defendants' fraudulent onboarding program and to populate their telemarketing and lead-purchasing sales force.

80.     On or about January 23, 2025, Plaintiff had encountered a 'Symmetry Financial Group - Trenkle Agency' job advertisement on LinkedIn for a part-time and full-time life insurance agent role that did not require a résumé, application, or internal vetting process that directed Plaintiff into self-scheduling interview processes. Upon information and belief, this recruiting system and platform was designed by McManamon to funnel high-volume internet traffic into round-robin self scheduled virtual 'interviews' with agents attempting to build a downline and advance within Defendants' system; the job listing used employment-oriented and entrepreneurial representations, including references to "compensation plus commission," "full- or part-time opportunities," "true ownership," "be your own boss," and "build your own business."

81.     Defendants and their agents, including McManamon, Leake, and Smith-Simonds, disseminated standardized job postings and communications through interstate wire channels that advertised and presented life insurance agent opportunities using vocabulary and labels that skewed the true nature of the role and contained promises of schedule control, business

18

ownership, equity participation, and predictable income ranges. These statements represented that agents would "set your schedule," "build your own business," and earn specified monthly income yet company infrastructure and policy conditioned agent success on adherence to Defendants' mortgage protection training systems, sales scripts, lead platforms, and production expectations. These representations were materially false, misleading, widely applied, and inconsistent with the opportunity made available to Plaintiff and similarly situated agents.

82.     On or about January 24, 2025, Plaintiff was funneled into a scheduled virtual interview with Walsh, who was presented as a Symmetry hiring manager. During the interview, Walsh claimed that Plaintiff would operate independently, own his book of business, control his schedule, and build his own insurance business using Defendants' platform. Walsh encouraged Plaintiff to quickly begin the company's onboarding process.

83.     Plaintiff was then directed to review Defendants' corporate overview materials and attend a new agent "Meet & Greet" virtual meeting with agency leadership, including Defendant Smith-Simonds, on or about January 27, 2025. These presentations and materials reiterated representations of independence, scalability, and entrepreneurial opportunity while omitting the extent of Defendants' centralized control over training, production inputs, platform access, and continued participation.

84.     Plaintiff was directed to subsequent onboarding videos led by Symmetry leadership, identified as Jamie and Cory, who represented that agents could join part-time, purchase leads, and earn "$3,000–$5,000 per month," while achieving time and money freedom. Symmetry leadership, including Defendant McManamon, frequently represented in and outside of these materials that Symmetry "provides those who partner with us the opportunity to earn both time and money."

19

85.     Plaintiff reasonably relied on these representations in deciding to proceed. Between January 27 – February 14, 2025, Plaintiff personally paid for and completed Defendants' required onboarding steps, including 'Xcel Solutions' pre-licensing education materials, state examination fees, fingerprinting, other licensing costs, and related setup expenses.

86.     On or about February 21, 2025, Plaintiff was directed by Walsh to execute the independent contractor agreement and submit his contracting and await appointment from Quility home office. On February 24, 2025, Plaintiff's contracting was complete and was instructed to access Quility HQ, begin 'Summit' training, create a 'SureLC' contracting profile, and login to Opt CRM.

87.     Following onboarding, Plaintiff received a series of emails generated through Defendant McManamon's recruiting platform on 'Bitrix,' imposing structured expectations regarding production, mandatory training participation, and advancement benchmarks. These communications specified revenue thresholds (e.g., producing $5,000 per week) as conditions for recognition, advancement, and continued opportunity within Defendants' system.

88.     Plaintiff and other newly onboarded agents were funneled by Symmetry leadership, including Defendants McManamon and Smith-Simonds, into Defendant Leake's mortgage protection training programs after licensure completion, which leadership represented as exclusive, proven, and foundational to success at Symmetry and within Danny Young's hierarchy. Defendants and associated persons represented to new agents that Leake's training allowed them to "speed up their business by 3-6 months."

20

89. Throughout Plaintiff's onboarding, Defendants framed adherence with training systems, production benchmarks, and lead purchasing as expected conditions of participation rather than optional business decisions.

90. These onboarding communications presented Plaintiff as an independent business operator while simultaneously conditioning success, advancement, and continued participation within Defendants' uniform and standardized training systems, recruitment methods, scheduled meetings, in-person events, supervisory hierarchies, and platform-controlled workflows.

91. Nonetheless, Plaintiff had already entered Defendants' system and incurred financial and labor expenditures under the reasonable belief that he was building an independent insurance business. Plaintiff was unaware that Defendants retained unilateral control over the training, platforms, data, and operational mechanisms that determined whether he could access his paid for leads, produce business, earn income, or continue operating.

92. On or about March 1, 2025, Plaintiff learned that Walsh, the hiring manager who interviewed him, had become his direct upline who received override commissions from Plaintiff's production. Plaintiff felt this to be strange and observed that this onboarding dynamic and arrangement was customary across Defendants' network of agents and inconsistent with the independent business representations made prior.

V. **Mortgage Protection Insurance Solicitation Practices**

93. Upon entry, Plaintiff and other agents were subject to extensive Leake and Quility mortgage protection sales training disseminated by and through Defendants' systems and in training meetings and modules.

21

94.     Plaintiff and other agents were required to purchase, service, and solicit company lead mailer-generated mortgage protection leads to earn income and as a condition of participation in Defendants' systems.

95.     Plaintiff and other agents were required to primarily utilize Defendant Leake's mortgage protection training and modules titled 'Mortgage Protection Sales Mastery Course' and 'Mortgage Protection University.'

96.     Defendant Leake was a principal architect and disseminator of Defendants' mortgage protection sales training, including scripts, presentations, recorded training, sales modules, product hierarchies, and live calls and appointments that trained agents on how to solicit consumers responding to the company's mortgage protection solicitations. Plaintiff and other agents used Leake's dialing scripts and sales training daily to solicit mortgage protection leads generated and distributed by Quility and Symmetry.

97.     Through Leake's and Quility's trainings, Defendants instructed agents to frame mortgage protection insurance as a mechanism for consumers to "protect the home," "pay off the mortgage," or "ensure the family keeps the house," regardless of whether the recommended coverage amounts, policy structures, beneficiary-designations, or consumer financial circumstances supported those representations.

98.     Plaintiff and other mortgage protection agents were not trained to assign policy proceeds to lenders or attach banks as beneficiaries; Leake trained mortgage protection agents to assign consumer-designated beneficiaries.

99.     Leake's training materials and consumer demonstrations emphasized emotionally charged sales techniques that directed mortgage protection agents to invoke fear of foreclosure, death, family displacement, or losing the home's equity value.

22

100.     Plaintiff and other mortgage protection agents were instructed to emphasize the emotional consequences of leaving a family "with nothing" upon the mortgageholders death and to suggest that failure to obtain coverage would result in the loss of the consumer's home, meanwhile the purported mortgage protection life insurance policies did not guarantee mortgage debt payoff.

101.     Leake's training did not distinguish between life insurance death benefits and mortgage payoff obligations. Plaintiff and other mortgage protection agents were instructed to represent to consumers that the policies being sold would satisfy outstanding mortgage balances, be portable across different mortgages or home loans, and/or capable of satisfying or assisting with monthly mortgage payments upon the insured's death.

102.     Plaintiff and other mortgage protection agents were required to attend, review, and implement Defendant Leake's mortgage protection training. Plaintiff reasonably understood and observed these trainings to be mandatory, leadership-approved representations, and standardized, not optional or independently developed sales approaches.

103.     Plaintiff became increasingly concerned that the sales representations being used throughout Defendants' mortgage protection marketing solicitations were misleading and deceptive to consumers and exposed agents to regulatory scrutiny, consumer complaints, and potential violations of insurance marketing and unfair trade practice laws.

104.     Plaintiff's concerns were heightened by the fact that mortgage protection constituted Defendants' dominant consumer acquisition channel, and that the misleading representations disseminated and taught to agents through Leake's trainings were systemic and commonly applied to over six thousand Symmetry agents soliciting consumers across the country.

23

105. When Plaintiff and other mortgage protection agents expressed difficulty using Leake's scriptings, they were told by leadership, including Defendants Leake, McManamon, and Smith-Simonds, to "get back on script" and to only use Leake's approved sales tactics and scripts.

## VI. Agent Conditioning and Control

106. After Plaintiff obtained his insurance license, Defendants began issuing structured instructions governing how Plaintiff was going to operate within Defendants' system. Plaintiff received communications, including emails generated through McManamon's recruiting and Quility's onboarding platforms, linking continued advancement and eligibility to mandatory participation in Defendants' proprietary training and oversight systems, including Quility's "Summit/Activate" program, weekly "Chris Leake Training," and upline manager "game plan" meetings.

107. These communications required Plaintiff to report pre-licensing and post-licensing activity, including lead purchases, dialing activity, appointment-setting efforts, and onboarding progress, to designated upline managers, operations personnel, and supervisory figures imposing stringent upline leadership oversight and reporting requirements upon Plaintiff, including instructions to transmit recordings of lead dialing calls and photographs of completed client qualification forms for purchased leads to his upline and/or Defendant Smith-Simonds.

108. Defendants, including Williamson, Resma, Kimbrell, Leake, McManamon, and Smith-Simonds, along with the founders and Danny Young, operated or hosted recurring interstate calls, and Zoom meetings and training that provided corporate directive and instruction to Symmetry agents. These meetings instructed agents on how to spend their time, recruit new

agents, generate income, interact with consumers, and remain eligible or profitable within Defendants' mortgage protection-centered platform.

109. These meetings, calls, and systems functioned as centralized supervision mechanisms through which Defendants transmitted directives, performance expectations, training mandates, and behavioral norms. Agents were not solely instructed on how to sell insurance, but on how to structure their time, shape sales priorities, conduct business, personally develop themselves, associate with the company, meet professional expectations, and define success within Defendants' system.

110. Defendants required or strongly encouraged Plaintiff and other agents to participate in these recurring leadership-led meetings and calls conducted via interstate wire communications. These calls were scheduled and occurred on fixed weekly and sometimes daily cadences. Plaintiff received regular wire communications from Defendants, including McManamon, Smith-Simonds, along with Walsh and administrative assistants, identifying specific Zoom video training and meetings to attend by day and time and instructing agents to be "active and engaged," encouraging agents to personally fund and attend in-person ticketed corporate events, and to organize their schedules around these meetings and conferences.

111. Symmetry agents' participation in these recurring national and agency virtual meetings and in-person conference events was treated as a condition of employment and continued opportunity. Frequent leadership communications from McManamon and others stated in substance that agents who were "serious," "committed," or "successful" attended these virtual meetings and conference events. Plaintiff reasonably understood his attendance to be mandatory.

112. These virtual meetings were not limited to sales education. Defendants used them to issue specific directives regarding the importance of onboarding new agents, lead strategies,

25

lead dialing and mortgage protection sales activity, advanced markets resets, reporting requirements, promotion of conference events, and ideal agent attributes. During these meetings, Defendants and senior leadership instructed agents on how many dials to make, how to structure daily activity, how to solicit mortgage protection life insurance, how to pitch the 'opportunity' to prospective recruits, how to perform advanced markets or reset practices, and what production or recruiting benchmarks were expected.

113. Defendants imposed specific performance targets and advancement criteria through internal advancement policy, virtual meetings, and other leadership communications. Plaintiff was instructed by Defendant McManamon that producing approximately $5,000 per week in issued premium was the expected baseline for mortgage protection agents seeking stability, recognition, and advancement within Defendants' system. Leadership communications reinforced that agents meeting these benchmarks were on track for growth, while those who did not were treated as failing to follow the system.

114. Defendant McManamon stated during virtual agency meetings that agents who did not attend corporate conference events would be "gone within six months or less" and faced failure in Defendants' system.

115. Symmetry's 'levels of leadership' policies and materials tied advancement eligibility and continued opportunity to Plaintiff and other agents' participation in designated training systems, APV submission, and new agent recruiting metrics. Plaintiff was instructed by Defendants, including Leake, McManamon, and Smith-Simonds, to attend corporate events and training, implement Leake's scripts and sales methodologies, and report progress to supervisory personnel within the hierarchy.

116.    Plaintiff was trained how to structure his workweek around Defendants' systems. His daily activities included agency or corporate meetings, lead purchasing through and data input into Opt CRM, lead dialing, client qualification forms, appointment setting, case prepping, underwriting coordination, client meetings, presentations, policy submission, data entry into spreadsheets and Opt CRM, follow-ups, and reporting to upline leadership. These tasks were dictated by Defendants' mortgage protection solicitation workflows and advancement infrastructure and were undertaken using Defendants' digital platforms and marketing materials.

117.    Defendants reinforced expectations that 'successful' agents devote themselves fully to their sales systems. Plaintiff understood and believed that his success within Defendants' sales systems required full-time commitment and that his outside employment would interfere with his advancement and ability to earn an income. In reliance on Defendants' sales systems, Plaintiff devoted himself to Defendants' operations and later curtailed outside employment in reliance on leadership representations to associate with the company and attend these virtual meetings and events.

118.    Plaintiff did so while receiving repeated assurances in leadership meetings, emails, texts, training sessions, and supervisory communications that adherence to their sales systems would lead to consistent production and income, including projections at or above $5,000 per week. Plaintiff began actively producing and reasonably believed he was nearing a breakthrough point based on his increasing production activity and systematic encouragement from Symmetry leadership of newly onboarded agents and upline leadership representations made to Plaintiff regarding his individual promise within the organization.

27

119.     Defendants conditioned income generation on continued financial inputs into centralized and progressively monetizing lead marketing and advancement systems, because Plaintiff and other mortgage protection agents were expected to increase lead spend budgets to remain economically viable and to purchase an increasing amount of mortgage protection leads through Defendants' lead marketplace to generate sufficient production activity or break even.

120.     Supervisory leadership, including Defendants Smith-Simonds and McManamon, communicated minimum lead-spend expectations and tied legitimacy and seriousness to ongoing weekly mortgage protection lead purchases. McManamon and other leadership personnel referred to Quility and Symmetry's leads marketplace as akin to an 'ATM machine' that yields '3-4x return' on the money an agent deposits into it.

121.     Lead pricing, quality tiers, availability, geographic location, and delivery were controlled by Defendants. Agents were conditioned to not negotiate pricing, select outside lead vendors, or access meaningful alternative consumer acquisition channels outside Defendants' systems, because company-generated leads were purportedly the "lifeblood" of the Symmetry agent's business and were made exclusive to Symmetry agents. The training Plaintiff received effectively forced Plaintiff into utilizing and purchasing these mortgage protection leads.

122.     Defendants retained authority to restrict, suspend, or terminate Plaintiff's access to carrier contracting and digital operational systems, including lead source, CRM portals, training modules, and carrier access. Loss of platform and carrier access would render a Symmetry agent incapable of servicing consumers or earning income.

123.     Defendants reinforced control on their mortgage protection salesforce through standardized leadership statements and presentations acknowledging the nature of the relationship. On or about April 21, 2025, Defendant Sierra Smith-Simonds stated in substance

28

that agents under her supervision "must be spending $150–250 per week on leads or they shouldn't be here." On or about May 12, 2025, Defendant McManamon stated to Plaintiff and other agents in a weekly agency meeting that "we treat this like a W-2."

124. Defendants' corporate policies and sales systems restricted new agent speech and conduct by prohibiting and deterring independent marketing, content creation, or solicitation outside Defendants' approved materials per the agent handbook and independent contractor agreement which required all such materials to be sent to and approved by Quility staff.

125. Plaintiff and similarly situated agents could not control their training regimens, production methodology, reporting obligations, lead sourcing, or professional development and advancement pathway. These meaningful facets of independent business operation were determined and withheld from these agents by Defendants' centralized policies, systems, training pipelines, and supervisory hierarchies.

126. Plaintiff and similarly situated agents bore the financial burden of obtaining licensure, onboarding expenses (e.g., prelicensing education, errors and omissions insurance), lead purchases, and production costs under the guise of building their own businesses.

127. Defendants, including McManamon, Leake, Smith-Simonds, Williamson, along with the founders, Danny Young, and other associated persons engineered agent conduct through virtual weekly and daily meetings, Sunday night interstate telephonic calls, multi-level hierarchical supervision, standardized mortgage protection practices, uniform new agent acquisition attitudes and practices, leadership sales and marketing puffery, engagement and association requirements for an agent's economic viability, and verbal framings to eliminate

29

meaningful agent independence while extracting labor, revenue, and recurring lead payments through Defendant-controlled systems.

128.    Defendants imposed defined production benchmarks and advancement thresholds through internal wire communications and agent-facing materials. Advancement eligibility was tied to specific revenue thresholds communicated through agent facing materials and emails showing "National Top Producer — $20,000 issue paid two months in a row," "Team Leader — $10,000 issue paid two months in a row," or "Agency Owner — minimum of $30,000 net placed for 3 months in a row with 6 sales reps (4 direct) for each qualifying month. (Target submit of $50,000) In order to qualify for Agency Owner you must be at a 105% contract level."

129.    Defendants maintained multiple written handbooks governing agent conduct that operated in parallel and reinforced one another. The Symmetry/Quility corporate agent handbook set forth systems-wide policies applicable to Symmetry agents, including platform usage (HQ and Opt), contracting and appointment procedures, commission routing and advanced markets resets, standards of conduct, and prohibited acts, including coordination with Defendant QFA.

130.    Plaintiff was also required to comply with the McManamon agency handbook, which addressed the same operational framework in greater detail and provided granular instructions concerning his onboarding, training attendance, lead purchasing, dialing preparation, sales execution, contracting steps, and ongoing agency activity. Both handbooks directed Plaintiff and other agents to resolve operational issues through designated upline supervisory chains and required regular consultation with upline managers and agency leadership, functioning together as an integrated system of rules and controls governing their activity.

131.    Plaintiff's daily work activities, weekly schedule, production priorities, and operational conduct were shaped and constrained by Defendants' handbooks, policies, platforms, and supervisory systems. Defendants operated and managed this infrastructure to resupply their agent inventory, and to funnel new agents, often those lacking prior industry experience, into standardized mortgage protection sales methodologies, prescribed marketing systems, defined advancement pathways, hierarchical supervision, and centralized leadership oversight.

132.    Through uniform and deceptive agent onboarding policies and representations, mandatory participation in meetings and events, specific production benchmarks and advancement criteria, financial dependency, platform control, and upline supervisory enforcement, Defendants conditioned newly onboarded agents to succumb to their uniform policies and solicitation practices under the guise of corporate professionalism, true ownership, and financial success, while they exercised control over the manner and means by which agents performed their work and displaced the economic risk and operational costs of that work onto Plaintiff and other agents.

## VII.    Revenue Extraction Infrastructure and Lead Monetization Model

133.    Defendants managed and operated a centralized revenue extraction system through which Plaintiff and other agents' labor, out-of-pocket expenditures, and production were monetized at multiple levels. Under this system, Defendants generated revenue not only from insurance commissions and overrides tied to agents' sales, but also from the sale of mortgage protection leads, technology and proprietary platform usage (e.g., Switchboard Funnel), corporate-hosted events (e.g., Engage, Advanced Markets Bootcamp), and other revenue streams.

134.    Defendants' mortgage protection representations were used to generate consumer leads by invoking fear of losing the home upon death and by implying a direct connection

31

between the insurance product and the consumer's mortgage obligation. Defendants marketed these consumer responses as leads and sold them to Symmetry agents, including Plaintiff. Defendant Leake trained agents to reinforce this consumer reliance during appointment-setting and sales interactions and to steer resulting sales into Defendants' designated core carriers and approved product hierarchies.

135.    In furtherance of this system, Defendants caused deceptive mortgage protection solicitation materials to be distributed to consumers nationwide in order to further supply their inventory of consumer responses sold as leads to Plaintiff and other agents through Defendants' lead marketplaces. Defendants structured new agent onboarding, training, and sales preparation around this consumer-acquisition process and designed their marketing and sales funnels to obscure the true nature of Defendants' business model while maximizing lead sales, agent dependency, and downstream revenue.

136.    The principal platforms used for lead purchasing and distribution was the Opt CRM system and HQ, which were branded, administered, and controlled by Defendants. Through these platforms, agents purchased leads and contact information generated by Defendants' marketing campaigns. Lead purchases were nonrefundable, sold without warranties, and sometimes imposed recurring financial obligations via standing lead orders through HQ, which were tied to continued lead distribution and platform participation.

137.    Defendants marketed several lead categories including mortgage protection "mail-in," "call-in," and "digital," leads to its agents. Plaintiff observed that the only leads made available to him and the majority of other agents were mortgage protection leads. Other purported lead categories (e.g., advanced markets, annuities, general life etc.) were either unavailable or never supplied.

138. Plaintiff and other Symmetry agents' work was integrated into Defendants' regular business operations and core revenue model. Plaintiff's labor, dialing activity, appointment setting, and policy production generated income for insurance carriers and Defendants, including Quility, Symmetry, Smith-Simonds, McManamon, and Leake through lead purchases, commission splits, overrides, and advanced markets routing, regardless of whether Plaintiff personally earned sufficient income. Defendants profited from Plaintiff's participation even during periods in which Plaintiff earned no commissions or incurred net losses.

139. Defendant Leake disseminated standardized scripts, presentations, and training materials directing Plaintiff and other agents to represent to consumers that mortgage protection policies would pay off the consumer's mortgage and that the agent was calling from, or affiliated with, the consumer's county mortgage protection office.

140. Plaintiff and other mortgage protection agents were instructed by Leake's training to represent that they had access to thirty or more insurance carriers that offer mortgage protection coverage. In practice, Plaintiff and similarly situated agents were typically calling consumers from their homes or other remote locations, not from any county mortgage protection office, and were often contacting consumers located in different counties or states. Agents' actual carrier access was limited to a defined set of carriers approved within Defendants' system, notwithstanding the representations made to consumers during appointment-setting calls.

141. The lead monetization and product-steering practices described herein were not isolated, accidental, or the result of individual agent discretion. They were designed, implemented, and maintained at the highest levels of Defendants' organizations through coordinated use of Defendants' digital platforms (including Opt and HQ), mortgage protection

33

marketing materials, standardized scripts and product hierarchies, agent handbooks, carrier contracting structures, and billing and compensation systems.

142. Defendants' senior leadership and supervisory personnel directly and indirectly enforced these practices across the Symmetry and Quility networks through standardized training, platform controls, supervisory hierarchies, and advancement criteria, ensuring that the same lead generation, sales, and monetization practices were applied uniformly to Plaintiff and to similarly situated agents nationwide.

143. The mortgage protection mailers caused to be distributed by Defendants falsely represented or implied that the solicitation was connected to the consumer's mortgage, lender, or loan obligation and that action was required to protect or satisfy a mortgage-related interest. The majority of mortgage protection leads sold to Symmetry agents, including Plaintiff, were generated through these mailers. Defendant Leake's training materials and presentations anticipated and addressed consumer confusion arising from these representations.

144. Plaintiff reasonably relied on the apparent legitimacy of Symmetry and Quility's mortgage protection marketing campaigns and Leake's mortgage protection training when purchasing leads, expending funds, and soliciting consumers. In practice, Plaintiff encountered repeated consumer confusion, objections, distress, and refusals that were directly traceable to the misleading mortgage protection content of the mailers. Defendants' use of the U.S. mails was intentional, material, and integral to generating leads, revenue, and downstream commissions.

145. Defendants structured their lead systems to increase agent dependency. Mortgage protection leads were tiered, priced, gated, and distributed exclusively through proprietary digital platforms. Plaintiff purchased the overwhelming majority of his leads through Opt and the remainder through the Quility HQ lead marketplace.

34

146.     Plaintiff and newly onboarded mortgage protection agents were initially restricted to aged mortgage protection "bonus leads" obtained through Opt until a minimum threshold of six (6) applications had been written on mortgage protection leads. This structure reasonably compelled Plaintiff to rely on Defendant-controlled lead sources for production, client access, and income.

147.     Defendants represented to Plaintiff and other agents that participation in Defendants' lead systems served as the primary, expected, and necessary method of generating production and income within Defendants' operations. These representations were consistently reinforced through standardized training, leadership communications, meetings, and platform design. Defendants knew or reasonably should have known that agents would rely on these representations in purchasing leads and devoting labor, as Defendants designed the system to leave agents without meaningful alternative methods of consumer acquisition unless and until agents satisfied stringent, Defendant-defined advancement thresholds.

148.     On or about June 4, 2025, Plaintiff received a call from a then-current Symmetry SME formerly associated with Symmetry, identified herein as "Walter," who had previously discussed alternative methods of consumer acquisition with Plaintiff. During that call, Walter instructed Plaintiff not to pursue organic lead generation and stated that Defendant Smith-Simonds had expressly warned that such activity would result in Walter's termination, and that Plaintiff and other agents were required to utilize standing lead orders or instant lead purchases through Symmetry and Quility without deviation.

149.     Plaintiff did not control lead pricing, carrier contracting, marketing channels, consumer acquisition methods, lead generation processes, platform infrastructure, sales training

35

systems, or compensation structures. Each of these components was determined and controlled by Defendants through centralized policies, platforms, and supervisory directives.

150.    Defendants implemented a structured "lead journey" system designed to migrate agents through progressively higher lead-quality tiers. Under this system, Plaintiff and similarly situated agents were required to purchase aged mortgage protection leads through Opt CRM before being permitted access to higher-quality leads. Plaintiff purchased the majority of his leads through Opt, and the remainder through HQ only after higher-tier "A leads" were unlocked.

151.    Access to higher-quality mortgage protection leads was conditioned on performance within Defendants' system. Plaintiff and other agents were required to solicit aged mortgage protection leads and submit a certain amount of applications before becoming eligible for access to higher-quality lead tiers.

152.    Lead pricing, quality tiers, geographic availability, exclusivity periods, and delivery were determined solely by Defendants through platform design and internal policy. Plaintiff had no authority to negotiate lead quality standards, distribution terms, refund policies, or pricing.

153.    Opt CRM categorized mortgage protection leads into defined tiers, including mail-in and call-in leads labeled MIB, MIC, MID, MIE, CIB, CIC, CID, CIE, and related designations, each with fixed pricing and exclusivity rules set by Defendants. Quility HQ primarily distributed higher-quality leads, including MIA and CIA leads, through standing lead orders once eligibility thresholds were met.

154.    Lead tiers and resale practices were based on agent turnover rates and sales outcomes. If no sale resulted during a lead's exclusivity period, the lead would be recirculated

36

back into Defendants' lead marketplace and resold to other Symmetry agents, allowing Defendants to monetize the same consumer multiple times.

155. The Opt CRM terms and conditions embedded in platform-generated lead receipts required agents to authorize "Quility Holdings LLC and its subsidiaries" to charge agents' credit cards for lead purchases. Lead charges were processed through Defendants' marketing systems and appeared under varying entity names on Plaintiff's bank statements.

156. For example, on June 28, 2025, Plaintiff purchased nineteen (19) mortgage protection leads through Opt CRM (Order No. 2025-69124IP). Platform-generated receipts indicated the charge would appear as "Symmetry Financial Group," while Plaintiff's bank statement reflected the charge as "Quility Marketing Opt."

157. Plaintiff and other agents bore the full financial risk of defective, unresponsive, or unusable leads, while Defendants retained lead revenue regardless of downstream production outcomes.

158. Defendants' lead journey system required agents to obtain standing lead orders to access higher-quality leads, creating recurring financial obligations tied to continued platform participation. Standing lead orders could only be terminated through written cancellation submitted to Defendants' Quility Leads Department.

159. For Plaintiff and similarly situated agents, lead purchasing functioned as a mandatory financial input required to access consumer demand within Defendants' operations, rather than an optional business choice.

160. Plaintiff understood these billing structures and lead systems to reflect centralized, integrated revenue capture through Defendants' platforms. Plaintiff did not contract with

37

independent third-party lead vendors and was not provided transparency regarding how payments were allocated or routed among Symmetry or Quility's affiliated entities.

## VIII.    Labor and Work Hours

161.    At all relevant times, including during pre-licensing and onboarding, post-licensing, and lead purchasing, Plaintiff relied on the representations and systems of Defendants and believed it to be a legitimate business endeavor made available to him that caused him to devote money, time, and labor into Defendants' sales and lead systems. Defendants did not track agents' hours worked, but did monitor Plaintiff and other agents' activity through onboarding thresholds, dialing metrics, conference attendance, production activity (e.g. premium volume, application counts etc.), lead purchases, recruiting activity, platform engagement, and submitted life insurance and annuity business.

162.    Between approximately February 13, 2025 and July 15, 2025, Plaintiff routinely worked in excess of forty (40) hours per week performing tasks, including mortgage protection and digital platform training, dialing purchased leads, conducting follow-up calls and text messaging, communications with uplines and administrative assistants, attending mandatory or expected training sessions and Zoom meetings, conducting presentations or virtual appointments, preparing applications, completing policy reporting requirements, and attempting to service existing and prospective clients through Defendants' proprietary systems.

163.    In several of these weeks, Plaintiff worked over forty hours yet received no compensation whatsoever, as no commissions were paid during those periods.

164.    Plaintiff's compensation was entirely contingent, delayed, and commission-based, dependent on the submission, underwriting approval, and payment of a

38

first premium by a consumer, a process that frequently took several days or weeks or longer and sometimes resulted in no commission at all.

165.    During weeks in which Plaintiff earned no commissions, Plaintiff incurred mandatory out-of-pocket expenses and personally funded the costs of operating within Defendants' systems, including pre-licensing modules, post-licensure costs, errors and omissions insurance, lead purchases, digital subscriptions, dialing costs, transportation, and time spent on mandated systems and meetings.

166.    As a result, Plaintiff's effective hourly compensation during these representative work weeks fell well below the applicable minimum wage, and in some weeks was negative, as Plaintiff expended money while receiving no wages.

167.    Defendants did not pay Plaintiff any salary, guaranteed minimum wage, overtime compensation, lead credits, bonuses, or draw during these periods, despite requiring or expecting efforts of full-time labor and commitment.

168.    Plaintiff progressed within Defendants' system and Defendants, including McManamon and Smith-Simonds, along with Walsh and other administrative staff, encouraged Plaintiff to begin building a team and step into leadership roles.

169.    On or about May 20, 2025, Plaintiff had ceased outside employment at the encouragement of these individuals and reasonably continued to rely on the purported viability of Defendants' systems. Plaintiff relied exclusively upon Defendants' platforms, leads, and carrier appointments as his sole source of income.

170.    On May 22, 2025, Defendant Smith-Simonds publicly announced in an agency group chat that Plaintiff had been promoted and achieved a 5% commission level increase. Defendants never implemented the promotion or adjusted Plaintiff's contract level.

39

171. Plaintiff was encouraged by leadership and administrative assistants to begin building a team within McManamon and Smith-Simonds' agencies. Shortly after Smith-Simonds' announcement, Plaintiff joined the agency leadership team and recruiting platform for the McManamon agency. McManamon positioned Plaintiff to act as a 'hiring manager' for the agency.

172. Defendants Leake, McManamon, Kimbrell, Sigworth, Resma, Williamson, Goforth, and Smith-Simonds each reasonably knew that Plaintiff's ability to earn income and support himself depended entirely on their continued approval and platform access. These Defendants were aware that Plaintiff's professional viability depended on maintaining licenses, carrier appointments, writing numbers, reputation, and regulatory standing, all of which were subject to Defendants' unilateral control.

## IX. Agent Compensation and Carrier Relationships

173. Defendants' systems and supervisory personnel controlled agent access to insurance carriers through centralized contracting systems and supervisory approval processes.

174. Plaintiff and other agents received carrier appointments through Defendants' contracting infrastructure and additional carrier appointments required agency owner approval from within Defendants' hierarchies. Smith-Simonds was Plaintiff's direct agency owner.

175. Plaintiff could not independently negotiate carrier appointment terms, commission schedules, or contracting conditions.

176. Insurance carriers issued Plaintiff's commission payments, yet Symmetry and Quility issued the compensation structure and commission schedules governing Plaintiff and other agents' commission levels and individual product payout percentages

from these carriers, as reflected in commission schedules provided through HQ/Opt, and leadership communications on contract levels/grids and advancement programs.

177. On or about February 24, 2025, Plaintiff executed digital independent contractor agreements in Quility proprietary contracting portals identifying "Quility Distribution LLC" as the entity responsible for issuing IRS Form 1099 income reporting. Neither the contract nor Defendants explained the entity's legal status, corporate affiliation, or authority to issue tax reporting.

178. After obtaining licensure and incurring onboarding costs, Plaintiff executed this agreement at Defendants' direction as a condition of participation. Plaintiff had never heard of, interacted with, or received any explanation regarding Quility Distribution LLC.

179. This conduct concealed Defendants' control over agent compensation routing and impaired Plaintiff's ability to gauge his initial platform participation or contracting decisions and burdened Plaintiff to later comply with federal tax obligations.

180. Quility Distribution LLC never made any direct payments to Plaintiff, and no funds paid to Plaintiff were labeled or transmitted as originating from that entity or any Quility subsidiary. Plaintiff has not received a Form 1099 from Quility Distribution LLC or Quility subsidiary.

181. Upon information and belief, Quility Distribution LLC does not appear as a registered or active entity in the records of the North Carolina or Delaware Secretaries of State, despite Plaintiff's reasonable search of publicly available records and business databases.

182. This compensation and contracting structure shifted regulatory and tax risk onto Plaintiff and other similarly situated agents while Defendants retained control over payment routing and commission grids. Defendants' concealment was material to Plaintiff's ability to

41

understand his compensation, employment classification, and assess the legal nature of his relationship with Defendants.

183. Defendants were aware that agents would rely on Defendants' representations regarding labor classification, compensation routing, carrier access, and commission structures in deciding to devote labor, incur unreimbursed licensure and lead expenses, and structure their livelihoods around Defendants' systems.

184. Defendants were aware that agents lacked access to independent information necessary to verify these representations due to Defendants' opaque, multi-level hierarchical structure and exclusive control over contracting portals, compensation disclosures, and platform data.

185. Defendants determined which carriers Plaintiff could access, set Plaintiff's commission contract level upon onboarding, dictated carrier commission grids and product payouts, routed commissions through centralized hierarchies, and imposed advancement criteria, product hierarchies, lead spend minimums, and override structures that reduced Plaintiff's net compensation, independent skill, and degree of control.

186. Access to specific carriers was subject to supervisory discretion and could be restricted or denied based on production status, hierarchy position, or internal policy.

187. Defendants, including Symmetry, QFA, Quility, maintained an internal list of carriers that agents were permitted to contract with to use for production activity. During Plaintiff's participation, Plaintiff was permitted to contract only with core carriers.

188. Defendants' carrier relationships allowed them to design and implement exclusive proprietary insurance products offered through some of the core carriers. Quility marketed these

42

proprietary products through centralized systems, and represented that only Symmetry agents had access to selling them.

189. Plaintiff and other newly onboarded agents were assigned an 80% commission level and were instructed and expected by Defendants Smith-Simonds and McManamon to submit their first insurance applications on themselves, specifically an accidental death policy issued through Mutual of Omaha, a directive that Defendants applied uniformly to new agents and enforced as a customary practice.

190. Afterwards, Defendants trained and required Plaintiff and other agents to purchase and solicit company-generated mortgage protection leads, follow Leake's scripts and presentation materials, and follow a leadership-approved product hierarchy that steered consumers toward these core carriers and proprietary products selected by Defendants. Leadership frequently encouraged agents to use "full comp" or Quility proprietary insurance products. In other words, Quility's proprietary products paid agents the highest commission they could earn.

191. Defendants promoted and prioritized proprietary or quasi-proprietary insurance products developed, branded, or distributed through Quility-affiliated arrangements, including but not limited to: SBLI EasyTrak; American Amicable Quility Secure Future products; Forester's Debt-Free Life; Banner Life Quility Term Plus; and Americo Eagle Select and Term series.

192. Plaintiff and other agents were repeatedly instructed by Defendants Leake, McManamon, and Smith-Simonds to focus on simplified issue mortgage protection business and that deviation from approved product hierarchies was discouraged or prohibited, and that agents who failed to follow leadership guidance risked restricted access to income, leads, platforms, support, or advancement.

43

193.     Plaintiff and other agents received weekly product-steering directives from Quility leadership, including the founders and corporate officers in national calls and social media videos, particularly with respect to SBLI's EasyTrak (a digital simplified issue term life product marketed as mortgage protection) and Foresters Financial's Debt Free Life (a digital simplified issue whole life product marketed as debt elimination) and other insurance or advanced markets-aligned product pushes.

194.     Plaintiff and other agents' ability to access certain carriers and products was subject to supervisory approval and internal policy enforcement. On or about April 20, 2025, Plaintiff requested access to an additional carrier to service a mortgage protection lead involving a diabetic client. The carrier had previously been identified in Leake's training as appropriate for servicing diabetic clients. Smith-Simonds denied Plaintiff's request, stating that the carrier was not commonly used and that Plaintiff had to submit at least fifteen applications before inquiring again. Plaintiff believed he had already satisfied this requirement, but was therefore prevented from accessing the carrier by Smith-Simonds.

195.     Defendants structured and determined the new agent's commission schedule for each carrier upon contracting. Defendants structured commission routing such that all production generated by new agents flowed through the hierarchies with Quility or Symmetry at the apex.

196.     Commission payments were routed through Defendants' contracting systems and subject to layered override structures. Commission override compensation was based off of downline agent production and flowed upward to the apex of the hierarchy. Symmetry, Quility, and supervisory personnel within the hierarchies received override income from downstream agent production regardless of whether the supervisors personally generated the underlying business, purchased the lead, or assisted the agent.

44

197. Plaintiff or other agents did not negotiate override or product payout percentages, routing structures, or compensation tiers. Commission grids, contract levels, and advancement thresholds were determined and fixed by Defendants' policies and systems.

198. Plaintiff's compensation and business ownership rights were dependent on Defendants' continued approval of carrier access, contract levels, agent standing, platform access, and system participation.

199. Quility corporate staff could revoke carrier and product access at any time from the North Carolina home office. An agent's carrier appointment or their access to Quility HQ and Opt CRM could be disabled by agency owners or Quility home offices, allowing both Symmetry- and Quility-affiliated entities to regulate both the availability of carrier relationships and the flow of agent compensation.

200. Defendants' centralized control over carrier access, contract levels, and commission routing allowed Defendants and other upline leadership to capture override income from Plaintiff's production. Plaintiff's production has directly affected override revenue flowing through Defendants' hierarchies.

201. This compensation structure created a direct financial incentive for Defendants to continuously onboard new agents, maintain control, suppress disruption, and prevent conduct that threatened revenue streams. These structures impaired Plaintiff's autonomy and ability to service clients, select carriers, and operate his own business.

202. Plaintiff's compensation was dependent on Defendants' centralized digital platforms, carrier contracting practices, commission grids and product payout percentages, company marketing and lead generation tactics, leadership, supervisory personnel, training, and policies.

45

## X.   Advanced Markets and Securities Activity

203.    Defendants implemented an advanced markets workflow under which consumer engagements originating from mortgage protection leads, including higher-premium cases and financial planning-related discussions, were internally routed to designated Symmetry SMEs, QFA-affiliated IARs, Advisor's Excel, or other agency owner-selected agents for further handling, product placement, or transaction execution consistent with Defendants' centralized policies and agent handbooks.

204.    The advanced markets structure was embedded within Quility's broader operational systems and functioned as a complementary workflow to Symmetry's primary mortgage protection client onboarding process.

205.    The advanced market system used mortgage protection agents to "reset" existing clients or leads to SMEs and IARs in the advanced markets pipeline. Symmetry and Quility leadership encouraged Plaintiff and other mortgage protection agents to perform resets and attend weekly reset training performed by various SMEs or agency owners and other agency leadership.

206.    The advanced markets workflows involved discussions or the handling of insurance, securities, and investment-adjacent topics, including annuities, retirement accounts, rollovers, retirement income planning, asset repositioning, debt elimination, infinite banking concepts, indexed universal life, and other financial planning products and services.

207.    Beginning in or about May 2025, Defendants including McManamon, Leake, and Smith-Simonds, and other leadership figures, repeatedly promoted and endorsed Defendant Tim Smith to Plaintiff and other agents in Zoom meetings and trainings as a designated and qualified advanced markets SME and IAR managing "over $400 million" in assets under management ("AUM"). Tim Smith introduced himself to Plaintiff and others as a fiduciary, insurance agent,

46

IAR, SME, and long-tenured financial advisor managing hundreds of millions in AUM. Plaintiff later discovered that Defendants' represented AUM figure materially exceeded the AUM disclosed in Tim Smith's then-current SEC public advisory filings, which reflected less than $90 million in AUM, rendering Defendants' endorsements and representations materially misleading.

208. Leadership personnel, including Defendants McManamon, Smith-Simonds, and Leake, instructed Plaintiff and other mortgage protection agents to reset clients to Tim Smith and other agency owner-approved Symmetry SMEs for advanced market solicitation appointments regardless of whether an insurance sale had been completed.

209. Plaintiff reasonably understood these directives as mandatory operational requirements tied to company policy, managerial expectation, and continued participation in Defendants' operations. Plaintiff successfully routed several clients through these advanced markets or reset workflows.

210. The advanced markets or reset system imposed structured commission-split arrangements and workflows dictated by the Symmetry and Quility agent handbook. Revenue allocation for routed cases was determined by Defendants rather than by independent negotiation or agent discretion.

211. Advanced markets workflows were administered through Defendants' proprietary platforms and digital processes, including standardized financial information forms, client qualification forms, internal routing requirements, QFA, and the use of Symmetry SMEs. Agents were prohibited from independently handling or resolving reset cases outside these systems.

212. Plaintiff observed that advanced markets routing removed meaningful client control from individual agents and placed it within Defendants' centralized oversight. Agents

were expected to comply with routing directives even where questions arose regarding licensure, scope of authority, or regulatory boundaries.

213.    Defendants designated specific individuals, including Defendant Tim Smith, as an endorsed SME and investment adviser, Tim Smith was spotlighted on recurring meetings and was held out to agents and clients as credentialed, compliant, and authorized to engage in advanced markets or securities-adjacent activities.

214.    Defendants did not disclose, display, or provide agents or consumers with state-specific insurance or securities licensure information, jurisdictional authorizations, or regulatory limitations applicable to the designated SMEs or IARs, including Tim Smith. Defendants provided no mechanism within their platforms, training materials, or reset workflows for agents to verify whether advanced markets personnel were property licensed or authorized to solicit or advise consumers in particular states.

215.    Plaintiff was present in and possesses recordings of reset/advanced markets presentations deployed to Plaintiff's Louisiana clients by Tim Smith. These recordings show Tim Smith displaying urgency and control of the meeting, credibility priming (claimed credentials, claimed institutional backing), estate document "on-ramp" (will/POA) to secure trust, immediate movement to retirement assets and rollover logistics, and product placement (insurance and annuity proposals) framed as "planning," "free advice," or "client protection."

216.    In an exemplar meeting with Plaintiff's Louisiana clients, Defendant Tim Smith used language/scripting to direct the meeting flow, position himself as a fiduciary-level professional and "investment" expert, provide specific allocation instructions for employer plans, and transition directly into insurance and investment-product discussions using QFA or Quility planning platforms and endorsed financial products.

48

217. In another exemplar meeting with Plaintiff's Louisiana client, Tim Smith implemented the same sequencing and asserted authority over estate documentation using a third-party digital will-drafting platform by directing the consumer's dispositive choices in real time, collecting sensitive identifiers for testamentary document furnishing, and then immediately discussed rollover/IRA setup and product discussions (including annuity and insurance proposals), presenting the workflow as simple, "turnkey," and part of a single integrated plan.

218. Tim Smith held himself out to Plaintiff's Louisiana clients as a fiduciary-level investment professional associated with Charles Schwab by claiming that his "brokerage arm" was Charles Schwab and invoking institutional research capacity backed by QFA. During these virtual solicitation meetings, Tim Smith provided client-specific investment allocation directives regarding employer retirement plans, described portfolio construction rules, and represented that the consumer's outcomes depended on following his recommended allocations.

219. Tim Smith directed immediate rollover and IRA-opening steps tied to Charles Schwab account onboarding, stated that accounts would be opened and retirement assets transferred, and discussed investment management using purported "algorithmic" signals and risk-control triggers.

220. Tim Smith promoted a high-bonus annuity-type arrangement, discussed tax consequences and conversion mechanics, and framed the structure to Plaintiff's Louisiana clients as a method to address taxes associated with retirement assets while supporting insurance and legacy planning.

221. Tim Smith employed credibility-engineering statements unrelated to the client's needs, including claims regarding personal pedigree and background, in close temporal proximity to fiduciary and institutional representations. Plaintiff witnessed Tim Smith represent

49

that he was a former retired racecar driver affiliated with the National Association of Stock Car Auto Racing ("NASCAR") and made additional biographical claims before directing the consumer to proceed with account onboarding, estate planning steps, and product proposals.

222. Tim Smith assumed operational control of a Louisiana client's estate document furnishing on a third-party platform, stating words to the effect of "I'm going to be you," and proceeded to complete dispositive selections while logged into the client's account, including beneficiary and executor selections. Tim Smith repeatedly framed these materials as "legal documents" while simultaneously disclaiming that he was not "in the legal business." Tim Smith requested and caused the transmission of personally identifying information, while directing estate document preparation and initiating retirement-asset onboarding.

223. Plaintiff alleges this advanced markets/reset workflow and intake process described herein was not discretionary, but a standardized, repeatable system designed and implemented to accelerate consumer commitment, transfer client control away from mortgage protection agents into Defendant-controlled platforms, personnel, and revenue channels as part of the Enterprise's regular way of doing business.

224. At all relevant times, Plaintiff was licensed only as a general lines life, accident, and health insurance producer and did not hold a securities registration or investment adviser representative authorization.

225. Plaintiff was instructed by Defendants, including QFA and Tim Smith, to perform brokerage account opening, risk tolerance reports, and suitability documentation for use in opening and funding Charles Schwab brokerage accounts.

226. Beginning on or about June 2, 2025, Defendants Tim Smith and a QFA representative, identified as Hailey Boegler, transmitted emails and instructions directing Plaintiff

50

to facilitate the opening of a Charles Schwab brokerage account for a client routed through the advanced markets pipeline. Plaintiff was instructed to obtain and upload client documentation into a designated "SolomonAPI" portal, including risk assessments and suitability-related materials used for brokerage account opening and funding. Plaintiff reasonably understood these instructions to be part of Defendants' advanced markets workflow and not as an isolated request.

227. At all relevant times, Defendant Tim Smith was licensed solely in California as an IAR and lacked securities licensure or authorization in Louisiana and multiple other states in which he solicited consumers through advanced markets workflows, as reflected in contemporaneous SEC public disclosure records and recordings possessed by Plaintiff. Tim Smith admitted to Plaintiff on or about June 7, 2025, that he lacked an insurance license in Louisiana. Plaintiff further understood, based on disclosures and communications from Defendants, that QFA did not possess active securities authorization for Louisiana during the relevant period.

228. Upon information and belief, Tim Smith and other SMEs facilitated the opening of or positioned agents to open Charles Schwab brokerage accounts and initiate rollovers from securities by directing or inducing insurance-only licensed agents to participate in securities-related or investment-advisory intake procedures, securities liquidations, and the opening and funding of Charles Schwab brokerage accounts in jurisdictions where the SME lacked appropriate securities licensure, resulting in unauthorized insurance agents performing suitability intake and securities-adjacent tasks.

229. Plaintiff discovered that Tim Smith was not properly licensed in insurance or securities for the business he was conducting with Plaintiff's Louisiana clients, and that Defendants had nonetheless routed client matters through him and attempted to induce Plaintiff

51

into committing securities intake processes and facilitating the opening of brokerage accounts. Collectively, Plaintiff recognized the serious regulatory and consumer risks involved, which directly precipitated Plaintiff's internal complaints and subsequent reporting regarding potential securities violations.

230.     Defendants, including QFA and Tim Smith, instructed Plaintiff to participate in conduct related to securities activity that Plaintiff believed to be unlawful or improper. Plaintiff reasonably understood that refusal would result in consequences or scrutiny from leadership. QFA and Tim Smith's emails intensified the fear surrounding Plaintiff's objections and contributed to Plaintiff's belief that his compliance was being demanded at the risk of professional destruction.

231.     Plaintiff alleges that Defendants employed Plaintiff and other agents to facilitate and onboard clients with securities, execute securities liquidations, open Charles Schwab brokerage accounts, and draft risk tolerance and suitability reports in a manner that had the effect of reducing direct regulatory exposure of Tim Smith and other SMEs or IARs who were not duly licensed in relevant states or authorized to handle securities.

## XI.     Good Faith Concerns and Internal Reporting

232.     Plaintiff reasonably believed Defendants were engaging in unlicensed or improper activity and exposing consumers and Plaintiff to regulatory harm based on his direct participation in and observation of Defendants' mortgage protection marketing, advanced markets routing, and licensing-dependent services. Plaintiff raised concerns internally because he observed conduct that appeared to violate securities and insurance laws and conflicted with Defendants' representations that such activity was licensed, compliant, and properly supervised. Plaintiff initially believed that internal reporting would result in corrective action.

52

233.    Leadership and agent handbooks instructed Plaintiff and other agents that operational issues were to be addressed through upline manager chains.

234.    During Plaintiff's tenure, Defendants did not provide agents with the name, contact information, or a defined channel for a compliance officer or compliance department.

235.    Plaintiff repeatedly encountered consumer objections, demands to be placed on do-not-call ("DNC") lists, and hostile reactions on a recurring and predictable basis arising from Defendants' mortgage protection marketing and lead systems. Plaintiff's previous CRM records and personal notes reflect recurring objections and DNC requests associated with leads generated through mortgage protection marketing. Plaintiff regularly observed questionable advanced markets routing activity being through Defendants' systems in a manner that raised questions regarding licensure, authorization, and regulatory exposure for Symmetry mortgage protection agents.

236.    Plaintiff witnessed conduct that raised questions regarding licensure, scope of authority, ethical practices, and regulatory compliance. Plaintiff observed conduct that appeared inconsistent with Defendants' representations that their insurance sales practices and advanced markets activity was properly licensed, ethical, and supervised.

237.    Plaintiff reasonably believed continued mortgage protection and advanced markets participation could expose him personally to regulatory involvement, civil liability, loss of licensure, and reputational harm because he held only insurance licenses and had no desire to act outside the scope of his licensure.

238.    Plaintiff and other agents relied on Defendants' representations regarding licensure and compliance because agents were actively routing clients into Defendants' advanced

53

markets workflows at Defendants' direction and through Defendants controlled systems, leaving Plaintiff and other agents with a reasonable belief that their clients would be properly and compliantly serviced. The relevant licensure information and supervisory controls were exclusively within Defendants' control and not transparently disclosed to agents. Defendants, including Leake, McManamon, Smith-Simonds, Williamson, and Resma, and other leadership figures represented SMEs to Plaintiff and other agents as endorsed, vetted, and compliant, and routed advanced markets activity through these individuals.

239. Plaintiff and Walter raised related concerns through similar internal channels, and Plaintiff did not observe corrective action resulting from Walter's efforts involving Defendants McManamon, Leake, and Smith-Simonds. Instead, and in close temporal proximity to Walter's internal reporting, on or about June 13, 2025, Walter was removed from Defendants' platforms and communication channels by Defendants, including McManamon and Smith-Simonds, which Plaintiff observed and understood as a punitive response to compliance-related objections.

240. On June 19, 2025, Plaintiff reported his concerns to Kimbrell and to Quility home-office channels. Plaintiff and Kimbrell communicated by telephone and text on June 19–20, 2025. Plaintiff was distressed, and Kimbrell represented that she would address the issues and speak with the related SME (not Tim Smith) and Quility home office.

241. Quility agent support, identified as Melissa Wellman, and Defendant Kimbrell directed Plaintiff to contact Defendant Sigworth, Quility's head of advanced markets sales. Sigworth spoke with Plaintiff by telephone, Plaintiff provided documentation supporting his concerns, and Sigworth did not provide further substantive response or assistance.

## XII.    Retaliation and Coercive Containment

242.    After Plaintiff's June 19 reporting, Plaintiff was contacted repeatedly by Defendants and leadership personnel. Plaintiff did not request contacts from Defendants Resma, Williamson, or Goforth.

243.    On June 20, 2025, Plaintiff texted McManamon and Tim Smith individually and explained to them that Plaintiff would be disengaging from the advanced markets workflow pending resolution of his securities and insurance regulatory and licensure concerns. Tim Smith created a group chat including Leake and Smith-Simonds and demanded Plaintiff to "publicize" his compliance concerns. Plaintiff stated he would not proceed on client matters with Tim Smith until his concerns were resolved.

244.    That same day, Leake and Smith-Simonds texted Plaintiff directing that Tim Smith would continue heading Plaintiff's client cases and that Plaintiff was expected to reengage and not speak to other clients or agents.

245.    On June 20, 2025, Plaintiff joined a Zoom meeting he reasonably believed would involve only Defendant McManamon. Upon joining, Plaintiff observed Defendants Leake and Smith-Simonds present without prior notice. The meeting lasted approximately two hours and involved coordinated questioning of Plaintiff regarding his internal and potential external reporting, repeated assertions that no violations had occurred, warnings regarding "serious legal consequences" if Plaintiff continued raising concerns, directives not to speak with clients or other agents about the issues, and pressure to abandon or soften his objections. Defendants leveraged their authority over Plaintiff's platform access, income, and professional standing throughout the meeting. Plaintiff experienced severe emotional distress during and after the meeting and

55

reasonably understood the encounter as an attempt to intimidate, isolate, and silence him in response to his good faith reporting.

246. On June 21, 2025, McManamon called Plaintiff multiple times and sent numerous texts asserting no violations occurred and transmitting materials purporting to justify Tim Smith's activity. McManamon sent Plaintiff multiple text messages questioning whether Plaintiff was ignoring him. McManamon transmitted legal statutes and AI-generated search results purporting to address securities licensure and SEC jurisdiction, representing them as disproving Plaintiff's concerns.

247. On June 24, 2025, Smith-Simonds contacted Plaintiff and informed him that an internal investigation had been completed and no issues were found. Smith-Simonds demanded Plaintiff's recordings/documentation and directed Plaintiff to reengage with Defendant Tim Smith. Smith-Simonds demanded that Plaintiff and his upline manager, Walsh, have a meeting upon her return from an Americo-sponsored trip to Mexico for a discussion regarding Plaintiff's operations and time moving forward. Plaintiff reasonably understood this to be in anticipation of further retaliatory action by Defendants for raising good faith concerns.

248. Smith-Simonds represented to Plaintiff that Defendant Tim Smith would continue heading Plaintiff's existing reset cases and characterized Plaintiff's continuance with Tim Smith as a "non-starter." Smith-Simonds asserted that Tim Smith was licensed in all fifty states by the SEC, managed hundreds of millions of dollars in AUM, and was backed by large-scale operations through QFA, and conveyed that these representations resolved any compliance concerns raised by Plaintiff.

249. On June 25, 2025, Williamson contacted Plaintiff, referenced Plaintiff's internal complaint, stating that he had received word of Plaintiff's "strong accusations." Williamson

56

represented that a "deep audit" had been conducted with the legal team and that no issues existed, characterized Plaintiff as having "perception reality issues," and discouraged external reporting while urging Plaintiff to rely on internal vetting rather than Plaintiff's firsthand observations.

250. While Defendants Leake, Tim Smith, Smith-Simonds, and McManamon applied pressure, Defendant Kimbrell reassured Plaintiff that the issues would be addressed, and Sigworth failed to intervene or provide guidance or protection. Williamson's conduct further contributed to confusion and uncertainty. This combination of intimidation, false reassurance, and inaction left Plaintiff in a prolonged state of fear, instability, and uncertainty regarding his professional standing.

251. On July 7, 2025, Defendant Resma contacted Plaintiff by telephone. Resma acknowledged Plaintiff's complaint surrounding potential securities and insurance violations and specifically questioned Plaintiff regarding his reports of potential violations to the SEC.

252. Resma asked Plaintiff several times whether he had reported Defendants to the SEC, Financial Industry Regulatory Authority ("FINRA"), or state departments of insurance. Resma simultaneously reaffirmed that Tim Smith had been fully vetted, was a credentialed fiduciary, possessed over twenty years of experience, and managed hundreds of millions of dollars in AUM.

253. Resma stated in substance that he did not want to go through the "regulatory litigation piece" because of Plaintiff's reported securities and insurance concerns and represented that Plaintiff would not be required to work with Tim Smith going forward. At the end of the call, Resma encouraged Plaintiff to "get on those leaderboards buddy."

57

254. On or about July 9, 2025, Plaintiff attended a national leadership call during which Symmetry founder, Brandon Ellison, stated in substance that "we love" Defendant Goforth and that he "keeps our ass out of trouble," reinforcing Plaintiff's understanding that Defendants prioritized suppression of scrutiny and internal containment over addressing the compliance concerns Plaintiff had raised.

255. Plaintiff's reporting was made in good faith and is supported by contemporaneous recordings and documentary evidence. Plaintiff did not receive documentation resolving the underlying licensing and compliance concerns he raised. Defendants' knowledge of Plaintiff's concerns was acknowledged across multiple levels of leadership.

256. Defendants leveraged their control over Plaintiff's income and professional standing during internal communications and meetings. Defendants Resma, McManamon, Smith-Simonds, Leake, Williamson, Sigworth, and Tim Smith conveyed, explicitly and implicitly, that Plaintiff's continued ability to work, earn income, and remain in the insurance industry depended on abandoning or re-framing his objections.

257. These communications were confrontational in tone and substance and were understood by Plaintiff as threats to his career and future. Defendants invoked their authority over Plaintiff and created a climate in which Plaintiff reasonably feared immediate and irreversible professional harm if he did not comply with their directives.

258. At all relevant times, Plaintiff had raised specific concerns regarding regulatory compliance, licensing exposure, and potential insurance and securities violations. These concerns were communicated directly or indirectly to Defendants, including Kimbrell, Sigworth, McManamon, Smith-Simonds, Leake, Resma, Williamson, Goforth, and Tim Smith. Despite

58

receiving these communications, Defendants did not meaningfully investigate or address Plaintiff's concerns through reasonable compliance, legal, or risk-management processes.

## XIII.    External Reporting

259.    Plaintiff's internal reporting did not result in remediation, compliance review, or corrective action. Instead, Defendants responded by disputing Plaintiff's concerns, discouraging further inquiry, continued endorsing Defendant Tim Smith, and escalating supervisory pressure without the underlying licensing, supervisory, or regulatory risks Plaintiff identified.

260.    Plaintiff reported Defendants' conduct to appropriate regulatory authorities to protect consumers, his licensure, and prevent further unlawful activity.

261.    On or about June 22, 2025, Plaintiff submitted a report to the SEC through the Tips, Complaints, and Referrals ("TCR") system concerning potential unlawful securities violations, supervisory failures, and regulatory noncompliance within Defendants' operations.

262.    On or about July 19, 2025, Plaintiff submitted a supplemental TCR to the SEC with additional documentation.

263.    On or about June 26, 2025, Plaintiff filed a complaint with the Louisiana Department of Insurance ("LDI") reporting insurance misconduct involving Defendants' operations and associated personnel.

264.    LDI notified Defendants of Plaintiff's complaint and requested a response. Defendants were therefore placed on actual notice of Plaintiff's protected regulatory reporting. On or about August 8, 2025, LDI transmitted to Plaintiff Defendants' written response, authored by Goforth acting as "chief legal officer," which addressed Plaintiff's allegations and his removal from Defendants' operations.

265.    In that response, Goforth affirmatively characterized Plaintiff's termination as voluntary and non-retaliatory, asserting in substance that Plaintiff requested to "part ways" and that Defendants merely "honored" that request by terminating the relationship and requesting carrier releases. These representations were false.

266.    Plaintiff did not resign and did not request termination. Plaintiff reported compliance concerns and sought corrective action.

267.    Defendants repeated the "voluntary request" framing in the July 15 termination letter authored by Goforth, which cited Plaintiff's LDI filing and stated in substance that Symmetry was "accommodating [Plaintiff's] request" and terminating the agreement and carrier appointments effective immediately.

268.    The termination letter further asserted post-termination restrictions and threats, including alleged carrier debt, potential reporting for "churning or twisting," restrictions on hiring Symmetry agents, and a nondisparagement prohibition. These assertions were made unilaterally by Defendants and were designed to deter Plaintiff from further reporting and to impair his ability to continue operating in the insurance industry.

269.    Plaintiff did not request termination or release from carrier appointments. Defendants' reliance on Plaintiff's LDI complaint in Goforth's July 15, 2025, letter to Plaintiff demonstrates Defendants' actual knowledge of the protected activity Plaintiff had undertaken prior to his termination.

270.    On or about August 8, 2025, Plaintiff received a closing communication from LDI acknowledging receipt of the complaint and responses stating that, due to LDI's limited statutory authority, it was not resolving disputed issues of fact between the parties and that such disputes

60

are properly addressed in court. LDI closed the complaint after receiving Defendant Goforth's written response.

271.    On or about July 20, 2025, Plaintiff submitted an IRS Form SS-8 request regarding worker classification and received a case number and assigned manager. Plaintiff has not received a Form 1099 from Quility Distribution LLC or any Quility subsidiary.

272.    Defendants' characterization of Plaintiff's removal was false and misleading. Plaintiff did not resign, abandon his position, or request termination. Defendants' coordinated reframing of Plaintiff's regulatory reporting as a voluntary request to terminate himself to regulators and Plaintiff was intended to conceal retaliation, justify adverse actions already taken, disrupt Plaintiff's business and client relationships, and mitigate Defendants' exposure to regulatory scrutiny.

## XIV.    Plaintiff's Termination

273.    At the time Plaintiff raised concerns and prior to his termination, Plaintiff was in good standing within Defendants' systems, Quility, and Symmetry.

274.    In the week preceding his termination, Plaintiff was ranked as a top ten producing agent within Defendant McManamon's agency, and was becoming a consistent and top producer within the Kimbrell master hierarchy.

275.    On July 15, 2025, Plaintiff attended a scheduled agency meeting that morning and observed that his name had been removed from leaderboards and agency rosters. This removal deviated from normal practice and occurred despite Plaintiff having ranked as a top ten producing agent in Defendant McManamon's agency the week prior.

276.    Prior to July 15, 2025, Plaintiff had not been disciplined for performance, and the termination notice did not identify performance-based reasons for termination. During his tenure,

61

Plaintiff had spent approximately $4,000 on Defendant-controlled digital systems and mortgage protection lead purchases. These expenditures were incurred at Defendants' direction and as a condition of participation in Defendants' operations. Plaintiff was actively working at the time of termination and had purchased a ticket and made arrangements to attend a Quility-sponsored in-person conference scheduled for August 2025, which Defendants had promoted as part of advancement and leadership development.

277.     At the time of his termination, Plaintiff had identified clients and transactions in progress, including advanced market resets, underwriting-pending cases, and follow-up appointments developed over several months. Based on Defendants' commission grids, product payout schedules, and the status of these matters, Plaintiff reasonably expected approximately $31,000 or more in earnings from near-closing transactions.

278.     On July 15, 2025, Defendant Goforth sent Plaintiff a letter formally severing Plaintiff from Defendants' system, terminating Plaintiff's carrier appointments and writing numbers, and invoking contractual and legal consequences. The letter was framed to suggest that Plaintiff's separation was voluntary.

279.     Defendant Goforth terminated Plaintiff's independent contractor agreement without prior warning and in connection with his termination, Defendant Goforth caused Plaintiff's carrier appointments to be released or terminated, deactivated Plaintiff's writing numbers, and Defendants Smith-Simonds, McManamon, and other administrative personnel removed Plaintiff from internal rosters, agency group chats, and other digital channels and systems.

280.     Plaintiff's access to HQ and Opt CRM was shut off. Plaintiff was unable to submit new business, service existing policies, access purchased lead data, retrieve client information, or

continue operating. The consumer leads Plaintiff purchased were housed within Opt CRM, and he was unable to recover, export, use, or access the data he had purchased once platform access was terminated.

281.     Upon termination, all access pathways to Plaintiff's purchased lead data were extinguished. Defendants' restrictions rendered Plaintiff unable to retrieve, export, or otherwise utilize the consumer information and clients he paid for, ensuring that his data remained within Defendants' exclusive control and outside Plaintiff's possession.

282.     Purchased leads and associated client information remained within Defendants' exclusive control within digital systems. Plaintiff was unable to professionally communicate with, transfer, or retain the customer relationships he had developed and acquired.

283.     Plaintiff could not service existing policies or clients without active writing numbers or carrier appointments. Once those were deactivated at Defendants' direction, Plaintiff was functionally barred from continuing to work.

284.     Following termination, Plaintiff sought clarification from his direct agency owner, Defendant Smith-Simonds, and upline Walsh regarding his access restoration, recovery of purchased leads, and transition assistance. Plaintiff was provided no operational support, no remediation, and no transition pathway. Smith-Simonds redirected Plaintiff to Defendants' legal counsel, effectively cutting off all practical avenues for assistance and funneling Plaintiff into legal silence rather than resolution.

285.     Defendant Goforth's termination letter imposed specific post-termination restrictions and threats, including warnings of alleged carrier debt, potential regulatory reporting for "churning or twisting," restrictions on hiring Symmetry agents for a defined period, and an ongoing prohibition on disparagement.

63

286.     The tone, content, and timing of Defendant Goforth's termination letter caused Plaintiff significant fear, confusion, and emotional turmoil. The letter invoked legal and regulatory consequences while simultaneously framing Plaintiff's separation as voluntary. In the context of Plaintiff's recent compliance reporting and his reliance on Defendants' systems for his livelihood, the letter reasonably conveyed that Plaintiff was being cut off from the industry and exposed to potential professional and regulatory harm.

287.     Plaintiff understood the communication as a warning that further reporting, communication with clients, or attempts to continue operating could result in additional legal or professional consequences. As a result, Plaintiff experienced a profound sense of professional isolation and vulnerability following his termination.

288.     Defendants' immediate termination of Plaintiff's system access, writing numbers, and internal communication channels compounded the impact of the termination letter. Within hours of receiving the letter, Plaintiff was removed from digital platforms, agency communications, and operational systems that he had relied upon daily to conduct business.

289.     These actions abruptly severed Plaintiff from colleagues, clients, and the infrastructure necessary to continue working in the insurance industry. The combination of the termination letter and Defendants' coordinated removal of Plaintiff from operational systems reasonably caused Plaintiff to believe that Defendants intended to isolate him professionally and prevent him from continuing his livelihood.

290.     The restrictions and warnings contained in Defendant Goforth's termination letter, together with Defendants' control over Plaintiff's carrier appointments, lead data, and industry standing, reasonably discouraged Plaintiff from communicating with clients, seeking alternative industry affiliations, or continuing to discuss the conduct he had previously raised internally.

64

291.     Plaintiff understood that Defendants possessed the practical ability to further damage his professional reputation, restrict his ability to obtain appointments with other carriers, and expose him to additional financial or regulatory consequences.

292.     Following termination, Plaintiff remained locked out of all platforms, deprived of purchased leads and client data, and stripped of carrier appointments and writing numbers. Over the weeks that followed, Plaintiff received confirmations from several insurance carriers reflecting appointment terminations initiated at Defendants' direction, further entrenching Plaintiff's inability to earn income, service clients, or reestablish himself in the industry.

293.     On August 6, 2025, Plaintiff directly contacted Defendant Goforth, seeking reimbursement for labor and lead purchases. Plaintiff explained that Defendants' actions deprived him of the use and benefit of the purchased data and requested temporary account access or reimbursement of the funds he had spent.

294.     Plaintiff requested that Defendants return his purchased leads, provide reimbursement, or alternatively provide temporary restoration of access in order to mitigate the harm caused. Goforth rejected Plaintiff's demand, dismissed Plaintiff's concerns as meritless, denied any obligation to compensate Plaintiff, and maintained that Plaintiff's separation was voluntary.

295.     Plaintiff was deprived of actual business opportunities, permanently denied access to purchased lead data, and threatened to not continue his profession using the customer relationships he had paid to acquire.

296.     The adverse actions described above occurred shortly after Plaintiff raised internal compliance concerns, disengaged from the reported conduct pending resolution, and submitted reports to state and federal regulators.

297. Plaintiff did not resign, request termination, or seek release from carrier appointments. Plaintiff was on a documented upward trajectory, earning recognition as a top-producing agent, and positioning himself for sustained earnings growth, which Defendants abruptly cut off.

298. Defendant Goforth's termination letter expressly referenced Plaintiff's regulatory filing and framed the termination as an accommodation of Plaintiff's alleged request to part ways, despite Plaintiff never requesting or providing written termination or release from carrier appointments.

299. The sequence, timing, and substance of Defendants' actions demonstrate that Plaintiff's reporting activity was known to Defendants and was followed by immediate and concrete actions that destroyed Plaintiff's livelihood and impeded his ability to continue working within Defendants' system or transition away from it.

300. Defendants treated Plaintiff and his reporting as a regulatory and litigation threat to their revenue model. After Defendants became aware of Plaintiff's reports, they initiated interrogation meetings, containment efforts, and progressive restrictions on Plaintiff's platform access and standing. Defendants demanded that Plaintiff turn over recordings and documentation, questioned whether Plaintiff had contacted the SEC or other regulators, and urged Plaintiff to rely on internal assurances rather than pursue external reporting.

301. Defendants' stated reasons for Plaintiff's termination were pretextual. Plaintiff was actively producing business, accessing systems daily, and had recently been publicly recognized for performance and advancement.

302.     Defendants' internal systems characterized Plaintiff as "inactive" in corporate post-termination emails and the framing of his termination by Goforth to Plaintiff and regulators as "voluntary" were false and are contradicted by Defendants' own records.

303.     The combined effect of the termination letter, the sudden loss of Plaintiff's ability to operate within Defendants' systems, and the restrictions imposed on his professional activity caused severe and persistent emotional distress. Plaintiff experienced significant fear regarding his professional future, and a sustained sense of vulnerability within the industry in which he had been working.

304.     On or about October 30, 2025, Plaintiff was clinically diagnosed with generalized anxiety disorder following the events described herein. Plaintiff's psychological condition materially affected his daily functioning, sense of safety, and emotional wellbeing.

## CLAIMS FOR RELIEF

### COUNT I – Racketeer Influenced and Corrupt Organizations Act

*Violation of 18 U.S.C. § 1962(c)*

*(Against All Defendants)*

305.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

306.     At all relevant times, Quility Insurance Holdings, LLC, Symmetry Financial Group, LLC, and Quility Financial Advisors, LLC, together with the individual Defendants who operated, managed, or directed the described systems and conduct, and other associated entities, constituted an enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4).

307.     The Enterprise had a common purpose: to generate and protect revenue by: (a) inducing consumers and agents through fraudulent mortgage protection marketing and deceptive

67

agent recruiting and onboarding tactics and representations; (b) monetizing consumers and agents through lead sales, insurance commissions, overrides, and proprietary products and platforms; and (c) maintaining economic control over agent production and revenue flow through captive corporate policies, commission schedules, digital infrastructure, carrier access controls, and retaliatory enforcement personnel and mechanisms.

308. The Enterprise had relationships and structure sufficient to pursue their purpose: (a) Quility provided centralized branding, lead marketing, agent contracting, corporate authority, and platform infrastructure; (b) Symmetry and agency leadership coordinated, recruited, trained, supervised, and enforced the mortgage protection, lead, and advanced markets systems through hierarchical management; (c) QFA and designated SMEs/IARs were integrated into advanced markets and reset workflows involving mortgage protection agents; and (d) other Enterprise leadership and corporate officers or supervisory personnel who coordinated containment and enforcement responses.

309. The Enterprise had longevity sufficient to pursue its purpose. From at least 2009 to the present, the core mortgage protection solicitation, lead monetization, and agent control systems have operated continuously, initially through Symmetry and affiliated entities, and later through Quility and its subsidiaries, producing sustained year-over-year annual premium volume growth as the Enterprise evolved.

310. Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs by directing, implementing, enforcing, or materially assisting the Enterprise's marketing and recruiting systems, agent and lead monetization practices, platform-based controls, carrier access, commission schedules, standardized scripts and training, and coordinated retaliatory actions.

68

311.    The activities of the Enterprise affected interstate commerce, including but not limited to the: (a) use of the U.S. mails to transmit mortgage protection insurance solicitations affiliated with the consumer's bank or mortgage company; (b) use of interstate wires to solicit consumers for mortgage protection insurance and to solicit new agents for onboarding into the Enterprise across state lines and nationwide; (c) operation and control of centralized, multi-state digital platforms that were used to solicit consumers, market and distribute lead data, track business, and control agent access; (d) arrangement and control of multi-state carrier contracting, appointment relationships, and commission routing for thousands of insurance agents; and (e) regular coordination of Enterprise directives and leadership tactics enforcing agent conduct, termination, platform lockout, and carrier releases through interstate communications and multi-state business processes affecting agents and consumers in multiple jurisdictions.

312.    Defendants conducted and participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity, consisting of repeated predicate acts including mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), witness tampering (18 U.S.C. § 1512(b)(3) and/or § 1512(d)), and witness retaliation (18 U.S.C. § 1513(e)).

313.    These predicate acts were related and shared common purposes, common participants, common methods (deception, virtual platforms, economic control, intimidation, termination, and mischaracterization), and common victims (consumers, Plaintiff, and other agents).

314.    ***Mail Fraud – 18 U.S.C. § 1341***

   a. From at least 2009 through the present, Defendants devised and executed a scheme to obtain money and property by means of fraudulent representations transmitted through the U.S. mails.

69

b. Defendants designed, approved, financed, and caused to be disseminated materially false and misleading mortgage protection insurance solicitations sent by U.S. mail to recently mortgaged consumers nationwide. These mailers used standardized bank and mortgage company/lender affiliation and formatting, mortgage-referenced language, and urgency cues intended to induce recipients to believe the solicitation was connected to a mortgage lender, bank, loan servicer, or mortgage obligation and required action to satisfy a mortgage-related interest.

c. The mailings were fraudulent because the policies sold through Defendants' system were ordinary life insurance policies that did not contractually satisfy mortgage debt, were not assigned to or affiliated with the consumer's lender or loan servicer, did not function as guaranteed mortgage payoff instruments, and were not required by any mortgage lender, yet policies were deliberately represented to and presented to consumers as mortgage debt protection and mortgage payoff instruments. Plaintiff possesses exemplar mortgage protection mailers reflecting these representations.

d. These mailings caused consumers to provide medical and financial information in response to the deceptive solicitations, generating lead inventory owned and controlled by the Enterprise and monetized through Enterprise-controlled platforms. Defendants sold these leads to Symmetry agents for solicitation, thereby producing downstream insurance commissions and override revenue for the Enterprise.

e. Plaintiff reasonably relied on Defendants' representations that the mortgage protection leads were vetted, compliant, lawful for solicitation, and suitable for

70

immediate consumer contact. Plaintiff was directed by Defendants, including Leake, McManamon, and Smith-Simonds, to purchase these leads. Plaintiff was directly injured in his business and property because he purchased leads generated through the fraudulent mailings, and the misleading content reduced the economic value of the lead through consumer confusion, objections, and do-not-call demands traceable to the fraudulent mail content.

315. *Wire Fraud – 18 U.S.C. § 1343*

    a. In furtherance of the Enterprise's schemes, Defendants knowingly transmitted and caused to be transmitted materially false and misleading statements and omissions by interstate wire, including job listings, recruiting emails, onboarding portals, recorded videos, virtual meetings, social media, emails, texts, and telephone calls.

    b. Recruitment and Onboarding Inducement

        i. Defendants issued uniform representations to Plaintiff, other agents, and prospective agents that they would operate an independent business, have compensation plus commission, own their book of business, control their work schedules, have broad carrier access, and build a scalable insurance business if they followed the system and purchased mortgage protection leads.

        ii. These representations were fraudulent, materially false, and misleading because they skewed the true nature of the relationship between the Enterprise and the prospective agent, and were used to induce reliance, individual participation, and labor or monetary inputs. The Enterprise required Plaintiff and other agents to operate through Enterprise-controlled

71

digital platforms, internal hierarchies, stringent advancement criteria and qualifications, restricted and limited carrier access, and retained economic and practical control over leads, client records, and operational viability while Enterprise leadership had discretion over agents' operations and carrier appointment authority.

    iii.    Plaintiff reasonably relied on these interstate wire representations in obtaining licensure, incurring expenses, purchasing leads, devoting full-time labor, and building his pipeline within Enterprise systems.

c.  Containment, Concealment, and Mischaracterization

    i.    After Plaintiff raised good faith concerns regarding unlawful conduct, Defendants used interstate wires to deceive and neutralize Plaintiff's reporting and procure for his submission and reliance on their representations through coordinated virtual meetings, calls, and messages falsely reassuring Plaintiff that investigations had been completed and no violations existed while withholding or misrepresenting material facts concerning state-level licensure, securities registration, supervisory authority, and regulatory exposure

    ii.    Defendants used both interstate wires and the U.S. mails to mischaracterize Plaintiff's separation as "voluntary" and "at Plaintiff's request," including in communications to regulators and in the July 15, 2025 termination letter, despite Plaintiff not resigning and despite his prior communications constituting a conditional remedial proposal expressly

72

seeking protection from retaliation and preservation of his business and career.

    iii.    These fraudulent communications and omissions were material to state regulators and damaging to Plaintiff and were intended to conceal regulatory risk and they were used by Defendant Goforth to fraudulently justify Plaintiff's removal while misrepresenting the true basis for Defendants' actions.

316. ***Witness Tampering – 18 U.S.C. §§ 1512(b)(3) and/or 1512(d)***

    a.    Defendants' intimidation and coercive conduct occurred after Plaintiff witnessed and raised concerns regarding potential violations of federal and state laws. While some Defendants knew regulatory reporting and investigation were reasonably foreseeable (McManamon, Leake, Smith-Simonds, Sigworth, Kimbrell, and Williamson), others explicitly knew that regulatory reporting had occurred (Resma, Goforth, and Tim Smith). However, each Defendant knowingly engaged in intimidation, threats, and corrupt persuasion to hinder, delay, or prevent communication of information to law enforcement and regulators and to pressure Plaintiff to abandon or soften his objections.

    b.    These acts of intimidation and corrupt persuasion inhibited lawful enforcement and included, among other things: a coordinated June 20, 2025 leadership meeting in which Plaintiff was confronted without notice by Defendants; warnings of potential legal consequences if Plaintiff continued raising concerns; repeated interrogation regarding the conduct Plaintiff witnessed and whether Plaintiff had contacted the SEC or other regulators; instructions not to speak with clients or

other agents about the issues; demands that Plaintiff provide Defendants

recordings and documentation of his reports; false assurances that all of

Defendants' conduct was compliant and lawful; fraudulent misrepresentations

regarding licensure and authority; fraudulent mischaracterization of Plaintiff's

termination to regulators; and Defendant directives that Plaintiff continue

participating in the challenged conduct despite his stated objections.

317. ***Witness Retaliation – 18 U.S.C. § 1513(e)***

    a. Defendants knowingly retaliated against Plaintiff and interfered with his lawful

employment for providing information relating to the commission and possible

commission of federal and state offenses to regulatory authorities by taking

adverse actions intended to interfere with Plaintiff's livelihood and lawful

employment, including termination, platform lockout, carrier releases, destruction

of access to purchased lead data, and the imposition of post-termination threats

and restrictions.

    b. Defendant Goforth issued a termination letter to Plaintiff expressly tying the

termination to Plaintiff's regulatory complaint and framing it as an

accommodation of Plaintiff's alleged request to part ways, while simultaneously

threatening ongoing restrictions and regulatory reporting.

    c. Defendants executed lockout and disablement measures that ensured Plaintiff

could not operate. Plaintiff was locked out of all platforms, removed from

communication channels, and his carrier appointments were terminated and

writing numbers deactivated.

318. The racketeering acts were not isolated or sporadic. The Enterprise's use of deceptive mortgage protection mail funnels, uniform agent inducement representations, lead monetization systems, proprietary digital platforms, standardized scripts and product hierarchies, centralized carrier and commission controls, and retaliatory enforcement mechanisms constitutes its regular way of doing business and poses a continuing threat of repetition as the Enterprise recruits new agents and solicits new consumers on an ongoing basis.

319. Plaintiff suffered concrete injury to his business and property by reason of Defendants' violation of 18 U.S.C. § 1962(c), including: out-of-pocket losses from obtaining licensure, onboarding costs, and lead purchases induced by Defendants' deceptive schemes; loss of possession and use of purchased lead data and associated business records; loss of in-flight transactions and commissions; loss of servicing capacity and related business expectancy; chargebacks and carrier debt exposure; and substantial impairment of Plaintiff's ability to earn income in the insurance and financial services industry.

320. Defendants' racketeering acts were the but-for and proximate cause of Plaintiff's injuries. Defendants' fraudulent representations induced Plaintiff to invest money and labor; Defendants' concealment and intimidation disrupted and halted ongoing transactions; and Defendants' termination, carrier releases, and platform lockouts directly deprived Plaintiff of purchased property, client relationships, and the ability to continue operating his business.

321. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff suffered the impairment and destruction of his future earning capacity and career trajectory in insurance and financial services, resulting from the loss of carrier appointments and writing numbers, deprivation of purchased lead data and CRM records, lost goodwill and client relationships, inability to service existing policies and clients, and industry-wide reputational

75

harm flowing from Defendants' retaliatory termination and mischaracterization of Plaintiff's separation.

322. Pursuant to 18 U.S.C. § 1964, Plaintiff is entitled to treble damages, costs, and reasonable attorneys' fees, with appropriate injunctive and equitable relief necessary to prevent and restrain Defendants' ongoing racketeering conduct.

### COUNT II – Racketeer Influenced and Corrupt Organizations Act

*Violation of 18 U.S.C. § 1962(d)*

*(Against All Defendants)*

323. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

324. Defendants knowingly agreed, combined, and conspired to conduct and participate, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

325. Each Defendant knew the essential nature of the Enterprise and its unlawful objectives and knowingly agreed that at least one member of the conspiracy would commit acts constituting violations of 18 U.S.C. § 1962(c).

326. Defendants' agreement is evidenced by their coordinated and interdependent roles, including but not limited to: the joint design, approval, and dissemination of deceptive mortgage protection solicitation funnels transmitted through the mails; the coordinated use of interstate wires to recruit, onboard, and induce agents through materially false representations concerning business ownership, carrier access, and operational autonomy; the shared operation and enforcement of centralized platforms, policies, and carrier-access controls used to route leads, commissions, and business records; the collective transmission of false reassurances,

76

mischaracterizations, and concealment communications after Plaintiff raised concerns; and the coordinated execution and ratification of retaliatory actions against Plaintiff.

327.    These actions were not isolated or independent decisions, but were undertaken pursuant to shared policies, leadership directives, and platform-based controls that required coordination among Defendants and mutual reliance on one another's participation.

328.    Defendants reached and maintained an understanding and agreement, explicit and implicit, among Enterprise leadership and supervisory personnel that the deceptive mortgage protection marketing, recruiting, and advanced markets practices described herein would continue to be used to generate revenue, and that Defendants would represent to Plaintiff and other agents that leads, securities-related activities, products, licensing status, and compliance posture were lawful, authorized, and properly supervised when Defendants knew or recklessly disregarded that such representations were false or materially misleading.

329.    Defendants agreed that any agent or participant who questioned, refused to participate in, or threatened to expose those practices through internal inquiry or reporting would be contained, neutralized, or removed through coordinated use of platform control, carrier access termination, mischaracterization of separation, intimidation, and economic disablement.

330.    The agreement was known to and shared by Defendants responsible for supervising and recruiting Plaintiff and other agents. Enterprise risk management communications, platform and carrier controls, and enforcement actions through Defendants Goforth, Resma, Williamson, Leake, Tim Smith, McManamon, Smith-Simonds, Kimbrell, and Sigworth; they agreed that one or more co-conspirators would commit overt acts of mail fraud, wire fraud, witness tampering, and witness retaliation in furtherance of the Enterprise's common purpose and as part of the Enterprise's regular way of doing business.

77

331.    Defendants' conspiratorial agreement is evidenced by their collective decision-making reflected in coordinated assurances, directives, and enforcement actions regarding securities and insurance activity that Defendants repeatedly represented to Plaintiff as licensed, compliant, and approved, while knowingly withholding or misrepresenting material facts concerning registration status, supervisory authority, and regulatory exposure.

332.    Defendants, including Tim Smith, McManamon, Smith-Simonds, Leake, Kimbrell, Sigworth, and QFA personnel, collectively represented through interstate communications that the advanced markets activity Plaintiff was instructed to support or facilitate was lawful and properly licensed, while simultaneously directing Plaintiff to continue participation and discouraging inquiry or escalation when Plaintiff raised compliance concerns and linking continued participation, access to platforms, and income eligibility to Plaintiff's compliance with those directives.

333.    Defendants' representations were knowingly false or misleading, were relied upon by Plaintiff in continuing Enterprise-directed activity, and were coordinated with subsequent containment measures and the facts demonstrate a shared understanding of deceptive mortgage protection practices, new agent inducement systems, concealment of regulatory risk, and retaliatory enforcement were integral components in furthering the Enterprise's revenue model and concealment objectives and that at least one conspirator would commit multiple racketeering acts to advance those objectives.

334.    Defendants knowingly agreed that the racketeering acts were not isolated, but were to be carried out as part of the Enterprise's regular way of doing business, and that such acts would affect interstate commerce through the repeated use of the mails and interstate wires.

335. In furtherance of the conspiracy, Defendants committed overt acts, including repeated mailings of deceptive solicitations, interstate wire communications transmitting fraudulent recruiting and containment representations, and coordinated acts of intimidation, retaliation, and economic disablement directed at Plaintiff.

336. Plaintiff was injured in his business and property by overt acts taken in furtherance of the RICO conspiracy, his injuries were the direct and proximate result of Defendants' knowing agreement and coordinated actions to conduct and participate in the Enterprise's affairs through a pattern of racketeering activity. Defendants' concerted conduct and conspiratorial agreement caused Plaintiff to suffer the injuries to his business and property, including loss of present income, destruction of business relationships and professional standing, deprivation of purchased data and platform access, and the foreseeable impairment and destruction of Plaintiff's future earning capacity and long-term career prospects.

337. Defendants are jointly and severally liable. Plaintiff seeks treble damages, costs, reasonable attorneys' fees, and appropriate equitable relief to prevent and restrain Defendants' ongoing and future conspiratorial racketeering conduct pursuant to 18 U.S.C. § 1964.

## COUNT III – Dodd-Frank Whistleblower Retaliation

*Violation of 15 U.S.C. § 78u-6(h)*

*(Against all Defendants)*

338. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

339.     Plaintiff is a "whistleblower" within the meaning of 15 U.S.C. § 78u-6(a)(6) because he provided information relating to potential violations of the federal securities laws to the Securities and Exchange Commission (hereinafter, the "Commission").

340.     On or about June 22, 2025, Plaintiff submitted information to the Commission, in the manner contemplated by Commission rule and regulation, concerning conduct he reasonably believed constituted violations of federal securities laws. Plaintiff's belief that the reported conduct violated federal securities laws was objectively reasonable and based on the facts known to him at the time of submission. Plaintiff's submission to the Commission constituted protected whistleblower activity under 15 U.S.C. § 78u-6(h)(1)(A).

341.     Defendants' knowledge is evidenced by repeated interrogations of Plaintiff regarding securities-related jurisdictional and authorization laws and whether he had contacted the Commission or other regulators (LDI, FINRA), demands for recordings and documentation, and internal discussions referencing regulatory exposure.

342.     After Plaintiff's whistleblower activity, Defendants discriminated against, interfered with, and terminated Plaintiff, including through termination letter, platform lockout, carrier appointment termination, reputational harm, and economic disablement.

343.     Defendants' discrimination of Plaintiff and economic disablement of his work constituted adverse action taken because of Plaintiff's protected whistleblower activity, and Defendants' stated justification for the termination was false and pretextual. Absent Plaintiff's protected whistleblower activity, Defendants would not have terminated Plaintiff, disabled his access to income-producing channels, or mischaracterized his separation.

344.     The temporal proximity between Plaintiff's SEC report and Defendants' termination of Plaintiff gives rise to retaliatory causation, and Defendants would not have taken

80

these actions but for Plaintiff's protected whistleblower activity within weeks of Plaintiff's submission to the Commission and following intensified internal scrutiny and containment efforts.

345.    Defendants' retaliatory acts were materially adverse and would dissuade a reasonable worker from engaging in protected activity, and caused Plaintiff to lose current income, suffer professional reputational harm, foreclose advancement opportunities, and lose future earnings and career growth reasonably expected but for Defendants' unlawful retaliation. Defendants' conduct effectively destroyed Plaintiff's ability to continue earning a livelihood.

346.    As a direct and proximate result of Defendants' retaliation, Plaintiff suffered retaliation, discrimination, and reputational harm, and is entitled to all relief available pursuant to 15 U.S.C. § 78u-6(h)(1)(C), including double back pay with interest, front pay in lieu of reinstatement, attorneys' fees and costs, and expert witness fees. Reinstatement is impracticable due to Defendants' destruction of the business relationship, Plaintiff's professional standing, and ongoing retaliatory posture and hostility.

## COUNT IV – Fair Labor Standards Act

*Violation of 29 U.S.C. § 201 et seq.*

*(Against Quility Insurance Holdings, LLC, and Symmetry Financial Group, LLC)*

347.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

348.    At all relevant times, Defendants Quility Insurance Holdings, LLC, and Symmetry Financial Group, LLC, were employers within the meaning of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(d).

81

349. Plaintiff and other similarly situated insurance agents were misclassified by the Defendants. Plaintiff and similarly situated agents were employees within the meaning of 29 U.S.C. § 203(e).

350. Under the economic realities test applied in the Fourth Circuit, Plaintiff and similarly situated agents were economically dependent on the Employer Defendants and functioned as employees as determined by the totality of the circumstances.

351. Defendants exercised substantial and uniform control over Plaintiff and other agents' manner and means of their work, including by: requiring the use of Defendants' proprietary digital platforms; controlling access to leads, clients, carrier appointments, commission schedules, product payouts, and advancement eligibility; mandating standardized scripts and presentations, workplace conduct standards, training programs, sales practices, and performance benchmarks; restricting agents from selling outside Defendants' approved carriers and systems; retaining unilateral authority to terminate agents, disable platform access, and eliminate their ability to work; and controlling whether agents were paid at all through commission routing, platform access, and carrier appointment control.

352. Agents' opportunity for profit or loss was dictated by Defendants' systems, not by independent managerial skill, entrepreneurial discretion, or market competition, and agents could not increase earnings through independent pricing, marketing, staffing, or customer ownership.

353. Although agents incurred expenses (licensing, leads, insurance, and operating costs), those expenditures were required costs of participation and did not reflect independent business ownership and were unreimbursed and non-discretionary.

354. Plaintiff and similarly situated agents who sold insurance through Defendants' lead funnels and carrier relationships were integral to Defendants' core business, and these insurance agents performed that essential function.

355. The relationship between Defendants and Plaintiff and similarly situated agents was continuous and indefinite, subject to Defendants' unilateral termination authority.

356. Plaintiff and similarly situated agents regularly worked part- and full-time work hours and in excess of forty (40) hours per week, including evenings and weekends.

357. Defendants failed to pay Plaintiff or similarly situated agents minimum wages for all hours worked and failed to pay overtime compensation at one-and-one-half times the regular rate for hours worked over forty per week, in violation of 29 U.S.C. §§ 206 and 207.

358. Defendants did not maintain accurate time or wage records for Plaintiff or similarly situated agents, despite requiring platform activity, in violation of 29 U.S.C. § 211(c).

359. Defendants' misclassification and wage violations were willful, knowing, and in reckless disregard of the FLSA. Defendants structured their labor classification system and business model to shift labor costs, payroll obligations, and compliance risk onto agents while retaining the benefits of a controlled, employee-like workforce. Defendants extracted economic value from agent labor, avoided wage obligations by falsely labeling agents as independent contractors, and relied on this labor misclassification to avoid minimum wage, overtime, payroll taxes, and recordkeeping obligations.

360. Defendants' failure to maintain time and wage records was not incidental but integral to their misclassification scheme, as accurate records would expose the full scope of unpaid labor extracted from Plaintiff and similarly situated agents.

83

361.    Under the totality of the economic realities, Plaintiff seeks to establish employee

status for himself and similarly situated agents who were subject to Defendants' uniform

misclassification and wage practices. Defendants applied the same classification policies,

compensation structures, operational controls, and recordkeeping failures to Plaintiff and other

agents nationwide, independently supporting collective action under 29 U.S.C. § 216(b).

362.    As a result of Defendants' violations of the FLSA, Plaintiff suffered unpaid

minimum wages and overtime compensation for all hours worked in excess of forty hours per

week, unreimbursed business expenses that reduced his wages below the statutory minimum, and

loss of lawful compensation.

363.    Plaintiff seeks recovery of unpaid wages, overtime compensation, liquidated

damages in an amount equal to unpaid wages, prejudgment interest, and reasonable attorneys'

fees and costs, pursuant to 29 U.S.C. § 216(b).


## COUNT V – North Carolina Unfair and Deceptive Trade Practices Act
### *Violation of N.C. Gen. Stat. § 75-1.1 et seq.*
### *(Against All Defendants)*

364.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if

fully set forth herein.

365.    Defendants were engaged in trade or commerce within the meaning of N.C. Gen.

Stat. § 75-1.1, including the commercial sale of mortgage protection or other insurance leads,

recruiting and onboarding of insurance agents, related digital access rights to proprietary digital

platforms, and monetization of insurance production, all directed and coordinated from North

Carolina.

366. Defendants marketed, sold, and monetized mortgage protection insurance leads to Plaintiff and other agents nationwide as a commercial product, representing that such leads were legitimate, compliant, high-quality, and suitable for lawful insurance solicitation, and that agents were purchasing and owning those leads as assets of their independent businesses capable of retention and continued use independent of Defendants' discretion.

367. Defendants engaged in unfair and deceptive acts and practices by generating leads through materially misleading marketing designed to induce consumer responses through confusion or false urgency, while selling those leads to agents without disclosing the deceptive nature of the underlying marketing or the predictable diminution in lead quality and economic value caused by consumer confusion, objections, and regulatory sensitivity.

368. Defendants were not members of a learned profession and were engaged in unfair and deceptive acts and practices by selling and marketing fraudulently-induced mortgage protection leads to Plaintiff while concealing the captive nature of Defendants' platform and that Defendants retained unilateral power to revoke access to those purchased leads, associated data, and business records through centralized platform control and termination, thereby rendering the represented 'ownership' of the leads illusory because Defendants could, and did, unilaterally extinguish access without refund or remediation and transformed the transaction into one in which Defendants retained the economic benefit while shifting the risk of loss entirely onto the agent.

369. The same deceptive conduct that induced Plaintiff to purchase the leads also enabled Defendants to retain and re-monetize the economic value of those leads and associated data through continued platform control and resale or reuse, establishing a direct and continuous causal nexus between Defendants' deceptive acts and Plaintiff's injury.

85

370.    The unfair or deceptive representations and omissions described above were material and had the capacity and tendency to deceive a reasonable insurance agent operating under Defendants' system, particularly where agents were required or strongly encouraged to purchase leads as a practical condition of generating income and remaining viable within the enterprise.

371.    Plaintiff reasonably relied on Defendants' representations and omissions regarding the legitimacy, compliance, quality, and ownership of the leads in deciding to expend his own funds to purchase leads and to build his business pipeline within Defendants' systems, particularly where Defendants' systems left agents without meaningful alternative sources to consumer acquisition. Plaintiff would not have purchased the leads, or would have purchased fewer or differently, had Defendants disclosed the deceptive nature of the lead-generation practices or the revocable nature of access to the purchased lead data.

372.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff suffered actual injury to his business and property, including out-of-pocket expenditures for leads whose value was materially misrepresented, loss of the economic value of a substantial volume of purchased leads and associated CRM data, and impairment of Plaintiff's developing insurance business.

373.    Defendants' conduct involved deceptive mortgage protection marketing, information asymmetry, exploitation of trust, unfair control over agent labor and access to purchased property, and the strategic use of termination and platform lockout to retain economic benefit while externalizing loss onto agents, constituting substantial aggravating circumstances sufficient to warrant treble damages under N.C. Gen. Stat § 75-16.

374. Defendants' unfair and deceptive practices were conceived, directed, and implemented from North Carolina and carried forth nationwide through centralized management, platform infrastructure, marketing campaigns, and lead-monetization operations involved in the sale of lead data and the inducement of agents to participate and purchase that data.

375. Defendants' conduct constitutes unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1 *et seq.*

376. Defendants' unfair and deceptive practices caused Plaintiff actual damages, including monetary loss, loss of business opportunities, and injury to his professional livelihood and the foreseeable destruction of his future earning capacity within the insurance industry, and Defendants have maintained an unwarranted refusal to make Plaintiff whole.

377. Plaintiff is entitled to treble damages, reasonable attorneys' fees, and costs, pursuant to N.C. Gen. Stat. § 75-16.

## COUNT VI – IIED

### *(Against All Defendants)*

378. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

379. At all relevant times, Defendants owed Plaintiff a duty to refrain from engaging in extreme and outrageous conduct intended to cause, or carried out with, reckless disregard of the likelihood of causing severe emotional distress, particularly where Defendants exercised substantial control over Plaintiff's licensure, livelihood, and continued ability to work.

380. Defendants engaged in a course of extreme and outrageous conduct that went beyond all possible bounds of decency tolerated by a civilized society, particularly in a

87

professional relationship involving licensing, livelihood, and regulatory exposure, where Defendants wielded their authority over Plaintiff's reputation and ability to work.

381. Defendants' conduct, as alleged herein, involved repeated intimidation through the use of professional authority, the exploitation of Plaintiff's known financial and professional dependence, the use of conflicting pressure and reassurance to destabilize Plaintiff, and the continuation of coercive and harmful actions following Plaintiff's termination.

382. Defendants' conduct included, but was not limited to: knowingly subjecting Plaintiff to coercive meetings, interrogations, and communications after he raised good faith concerns; deliberately placing Plaintiff in an untenable position by forcing him to continue working with an individual Plaintiff reasonably believed to be engaged in unlawful activity, while signaling that refusal would jeopardize Plaintiff's standing and career; falsely reassuring Plaintiff that no violations existed and that internal review had resolved the issues, while concealing material facts and preparing retaliatory action; abruptly terminating Plaintiff after he was a top-producing agent and mischaracterizing the termination as "voluntary," despite knowing Plaintiff had not resigned and had expressly sought protection from retaliation; executing a coordinated economic shutdown of Plaintiff's professional life by coordinating leadership intimidation, revoking platform access, disabling operational systems, causing carrier appointment terminations, and issuing threats concerning regulatory reporting, close carrier observation for "churning or twisting," and future career restrictions; and intentionally isolating Plaintiff, removing him from professional channels and leaderboards, and rendering him unable to service clients, earn income, or safely transition his career.

383. Defendants knew, or recklessly disregarded, that Plaintiff was uniquely vulnerable to emotional harm because his professional license, reputation, livelihood, and future career

88

prospects depended entirely on Defendants' representations, platform access, and carrier

relationships, and because Plaintiff had expressly communicated his fear of regulatory exposure

and career destruction.

384.    Defendants' conduct was not the result of mere insults, ordinary workplace

conflict, contractual enforcement, or business disagreement, it was a calculated and retaliatory

campaign of intimidation, misrepresentation, and economic coercion designed to punish Plaintiff

for reporting misconduct, silence further disclosure, and shift legal and regulatory risk onto

Plaintiff.

385.    Plaintiff suffered severe emotional distress, including but not limited to intense

anxiety, humiliation, fear for his professional future, emotional anguish, and psychological

trauma so severe and sustained that no reasonable person could be expected to endure it.

386.    Plaintiff's emotional distress was not fleeting, trivial, or transitory. It was

profound, sustained, and debilitating, arising from the destruction of Plaintiff's career trajectory,

the threat to his professional license, the loss of his livelihood, and the deliberate uncertainty

imposed by Defendants' actions.

387.    As a direct and proximate result of Defendants' intentional infliction of emotional

distress, Plaintiff suffered severe emotional distress and a lasting emotional footprint was made,

including a medically diagnosed anxiety disorder.

388.    Plaintiff has suffered emotional distress damages in an amount to be determined at

trial. Defendants' conduct was willful and malicious, and carried out with conscious disregard,

entitling Plaintiff to compensatory and punitive damages.

## <u>COUNT VII – Civil Conspiracy</u>

### *(Against All Defendants)*

389.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

390.     Defendants acted together, in concert, to carry out the retaliation, tampering, harassment, platform lockout, and termination undertaken in response to Plaintiff's whistleblowing.

391.     Defendants, including Goforth, Williamson, Resma, Leake, McManamon, Tim Smith, Sigworth, Kimbrell, and Smith-Simonds acted together to commit one or more of the bad acts complained of herein.

392.     Defendants are jointly and severally liable for one another's unlawful acts done in furtherance of their agreement or conspiracy to neutralize and terminate Plaintiff.

393.     As a result of the conspiracy, Plaintiff has incurred damages due to Defendants' coordinated acts and is entitled to compensatory and punitive damages for their malicious behavior.

## <u>PRAYER FOR RELIEF</u>

*WHEREFORE,* Plaintiff respectfully requests that judgment be entered in his favor and against Defendants, jointly and severally, and that the Court award the following relief:

A. A declaration that Defendants' conduct violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) and (d); the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h); the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*; the North Carolina Unfair and Deceptive

Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq.*; and North Carolina common law governing intentional infliction of emotional distress and civil conspiracy;

B. Preliminary and permanent injunctive relief enjoining Defendants from continuing the unlawful practices alleged herein;

C. Compensatory damages in an amount to be proven at trial for all injuries to Plaintiff's business, property, and person caused by Defendants' unlawful conduct, including but not limited to lost income and commissions, unreimbursed expenses, loss of business opportunities, damage to professional reputation, and loss of future earning capacity and destruction of Plaintiff's career trajectory;

D. Treble damages pursuant to 18 U.S.C. § 1964(c);

E. Double back pay, front pay, expert witness fees, and all other relief authorized under 15 U.S.C. § 78u-6(h);

F. Unpaid minimum wages, unpaid overtime compensation, and liquidated damages pursuant to 29 U.S.C. § 216(b);

G. Treble damages pursuant to N.C. Gen. Stat. § 75-16;

H. Reasonable attorneys' fees, litigation costs, and expenses;

I. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

J. Punitive damages for Defendants' willful, malicious, and reckless conduct;

K. Such other relief as the Court deems just and proper to fully remedy Defendants' unlawful conduct.

## **JURY DEMAND**

394. Plaintiff demands trial by jury in this action of all issues so triable.

91

Date: March 4, 2026          Respectfully Submitted,

Jackson C. Young Brooks
Plaintiff, *Pro Se*
Mailing: P.O. Box 41, Carencro, LA, 70520-9998
Email: jacksonyoungbrooks@gmail.com
Telephone: 337.308.0702