# THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:26-cv-00075-MR-WCM

| | | |
|---|---|---|
| JACKSON YOUNG BROOKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF** |
| vs. | ) | **DECISION AND ORDER** |
| | ) | |
| QUILITY INSURANCE HOLDINGS, | ) | |
| LLC, SYMMETRY FINANCIAL | ) | |
| GROUP LLC, QUILITY FINANCIAL | ) | |
| ADVISORS LLC, MATTHEW | ) | |
| GOFORTH, MICHAEL RESMA, | ) | |
| BRIAN WILLIAMSON, | ) | |
| LISA KIMBRELL, CHRIS LEAKE, | ) | |
| CRAIG MCMANAMON, SIERRA | ) | |
| SMITH-SIMONDS, JEFF SIGWORTH, | ) | |
| and TIM TAYLOR SMITH, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 4].

## I.    BACKGROUND

On March 10, 2026, the Plaintiff Jackson Young Brooks, proceeding *pro se*, initiated this action by filing a Complaint asserting a wide range of claims predicated on the alleged unlawfulness of the Defendants' business practices.  [Doc. 1].  The Defendants are insurance sales and marketing

entities, officers and employees of those entities, and additional individuals affiliated with those entities. [Id. at ¶¶ 9-20]. Between February and July 2025, the Plaintiff, a licensed insurance agent, worked as an independent contractor for Defendant Symmetry Financial Group, LLC ("Symmetry"). [Id. at ¶ 8; Doc. 4-1 at 4-18]. The Plaintiff generally alleges that the Defendants operated a deceptive and unlawful insurance distribution network and retaliated against the Plaintiff by terminating him on July 15, 2025 after learning that he had filed a whistleblower complaint with the Louisiana Department of Insurance. [Doc. 1 at ¶¶ 1-4, 263-69]

On March 30, 2026, the Plaintiff filed the instant "Emergency Motion" seeking a Temporary Restraining Order ("TRO") and Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. [Doc. 4]. The Plaintiff states that upon his termination he lost access to certain systems and client data managed by the Defendants. [Id. at 2-3, 6]. The Plaintiff further states that his inability to access those systems and data prevents him from satisfying certain ongoing post-termination obligations and thereby exposes him to potential professional and financial harm. [Id. at 3-4]. To mitigate that exposure, the Plaintiff seeks a temporary restraining order and preliminary injunction to prevent the Defendants from enforcing post-termination provisions of his Independent Contractor Agreement with

Symmetry and from directing the Plaintiff to engage with policyholders associated with the Defendants' system or representing that the Plaintiff is obligated to take or refrain from any policyholder-related actions. [Id. at 9].

On April 2, 2026, a group of Defendants—Symmetry, Quility Insurance Holdings, LLC ("Quility"), Matthew Goforth, Michael Resma, Brian Williams, and Jeff Sigworth—filed Notice of their intent to oppose the Plaintiff's emergency motion. [Doc. 6]. On April 13, 2026, those Defendants filed a timely Response. [Doc. 8]. The remaining Defendants—Quility Financial Advisors, LLC, Lisa Kimbrell, Chris Leake, Craig McManamon, Sierra Smith-Simonds, and Tim Taylor Smith—have yet to make an appearance in this matter. The Plaintiff filed an early Reply in support of his motion on April 10, 2026, [Doc. 7], and an additional Reply on April 20, 2026, [Doc. 9]. Having been fully briefed, this motion is now ripe for disposition.

## II. DISCUSSION[1]

"In deciding whether to grant a temporary restraining order, the court employs the same standard applicable to the issuance of a preliminary injunction." King v. United Way of Cent. Carolinas, Inc., No. 3:09CV164, 2009 WL 10727585, at *1 (W.D.N.C. Apr. 20, 2009). Temporary restraining

---

[1] Rather than set forth the relevant facts in a separate section, the Court has incorporated the relevant facts into its legal analysis.

orders and preliminary injunctions are both "extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." MicroStrategy, Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001) (quoting Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 816 (4th Cir. 1991)).

To obtain temporary or preliminary injunctive relief, a plaintiff must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) injunctive relief is in the public interest. Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008). Thus, in each case the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987). A plaintiff's entitlement to temporary or preliminary injunctive relief is a matter of discretion with the Court. See Metropolitan Reg'l Info. Sys., Inc. v. American Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013).

A plaintiff seeking temporary or preliminary injunctive relief must make a "clear showing" of entitlement to relief. Winter, 555 U.S. at 22. Regarding the "irreparable harm" factor, "the movant must make a clear showing that it

4

will suffer harm that is neither remote nor speculative, but actual and imminent." Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell, 915 F.3d 197, 216 (4th Cir. 2019) (internal quotation marks omitted). Moreover, "[m]ere injuries, however substantial, in terms of money, time and energy . . . are not enough," as "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017) (internal quotation marks omitted).

Here, the Plaintiff generally asserts that he faces ongoing professional harm, financial harm, legal exposure, and potential exclusion from his industry, [Doc. 4 at 2-6, 8], and that his "industry viability is actively deteriorating in real time." [Doc. 7 at 2]. The question before the Court is whether the Plaintiff has clearly shown that the harm he faces is irreparable and is likely to occur in the absence of injunctive relief.

Pursuant to the Plaintiff's Independent Contractor Agreement ("Agreement") with Symmetry, the Plaintiff may be subject to "chargebacks" for commissions that he has already been paid but has not yet earned. [Doc. 4-1 at 7]. If an insurance policy for which Symmetry paid the Plaintiff an unearned commission lapses prematurely, then Symmetry may demand repayment of the unearned commission as a chargeback. [Id.]. Accordingly,

5

the Agreement characterizes an unearned commission as "a loan . . . to the Contractor, until such premiums become earned." [Id.]. Such chargeback exposure arises upon the payment of an unearned commission and terminates only when the commission is either earned or repaid. As a result, the Plaintiff's chargeback exposure arose while he was working as an independent contractor and continued after his termination to the extent that he continued to possess unearned commissions.

Most of the Plaintiff's present concerns about professional and financial harm appear to stem from his chargeback exposure. For example, the Plaintiff states that in March of 2026, eight months after the termination of his position with Symmetry, he received an email from a Quility employee that "directed" him "to contact a policyholder regarding a potential chargeback exposure despite Plaintiff's lack of authority or system access to do so." [Doc. 4 at 3]. According to the Plaintiff, that email is illustrative of his ongoing "post-termination obligations" that he is unable to satisfy because of his inability access to certain systems and client data managed by the Defendants. [Id. at 2-3]. The Plaintiff asserts that because he cannot satisfy those obligations, he has been subject to "chargeback-related activity." [Id. at 4].

Such chargeback-related activity, in turn, purportedly impedes the Plaintiff's ability to continue working as an insurance agent. Because the Plaintiff's "appointments" with insurance carriers were terminated upon the termination of his position with Symmetry, the Plaintiff subsequently needed to reestablish his appointments with insurance carriers in order to continue selling their insurance products. [Doc. 7 at 4]; see also [Doc. 4-1 at 23]. However, according to the Plaintiff, he has been unable to reestablish some of those appointments with carriers because he remains "subject to chargeback obligations"—i.e., because he has outstanding debts to certain insurance carriers. [Doc. 7 at 4]. For example, the Plaintiff states that he was "terminated by Aetna following chargeback-related activity." [Id.]. Emails submitted by the Plaintiff tend to show that Aetna terminated the Plaintiff's appointments with Aetna because the Plaintiff failed to timely pay Aetna a $2417.22 debt. [Doc. 4-1 at 33-36]. The Plaintiff states that his relationships with other insurance carriers have also been negatively impacted by similar chargeback-related activity and that, as a result, he is being functionally excluded from the insurance agent marketplace. [Doc. 7 at 4].

Beyond the Plaintiff's unpaid Aetna balance and the email regarding a potential chargeback, however, the Plaintiff has not provided the Court any

7

indication of the extent of his current or future chargeback exposure. Although the Plaintiff asserts that the "passage of time . . . increases the magnitude of the exposure," [Doc. 9 at 3], he has failed to offer any nonconclusory allegations regarding whether and to what extent he continues to possess unearned commissions that could be subject to a chargeback. As a result, the Plaintiff has not clearly shown whether or to what extent his chargeback exposure is likely to continue in the absence of injunctive relief.

Moreover, the Plaintiff's account of the March 18, 2026 email he received is contradicted by the Plaintiff's own evidence. [Doc. 4-1 at 2]. The Plaintiff was not, in fact, "directed" to contact the relevant policyholder, and the Plaintiff was provided with the relevant policyholder's phone number so that he could contact her without needing access to Symmetry's systems or client data. [Id.]. The March 18, 2026 email put the Plaintiff on notice of a potential chargeback, but it did not direct the Plaintiff to take or refrain from any action, nor did the email show that any action or inaction by the Plaintiff would make the potential chargeback less likely to occur. [Id.]. The Plaintiff has not clearly shown that he has ongoing post-termination obligations that he is unable to satisfy other than his outstanding debts, if any such remain. Given that such debts appear to be owed to insurance carriers like Aetna,

who are not parties to this litigation, and not to the Defendants, the Plaintiff has also not clearly shown that the injunctive relief he requests would limit his chargeback exposure. The likelihood and extent of the Plaintiff's chargeback exposure, and of any professional harm related to that exposure, in the absence of injunctive relief are therefore a matter of speculation.

The Plaintiff has also failed to clearly show that such chargeback exposure is or causes irreparable harm. First, the Plaintiff has not clearly shown why a chargeback, if later shown to be unlawfully imposed or the foreseeable result of an unlawful business practice, could not be adequately remedied by monetary damages at the conclusion of litigation. Second, while the Plaintiff has shown that his failure to pay Aetna led to the termination of his Aetna appointments, he has not clearly shown that anything other than his failure to pay his own debts is preventing him from reestablishing those appointments or his appointments with other insurance carriers, such that later payment would sufficiently rehabilitate his professional prospects, despite his general and conclusory assertions to the contrary. See [Doc. 9 at 7]. Third, the Plaintiff asserts that his "industry viability is actively deteriorating in real time," and that he has been subject to "adverse reporting" and "account-level events" that cause harm to "business relationships" that "cannot be meaningfully undone through damages." [Doc.

9

7 at 2-5]. He further asserts that he faces ongoing "legal exposure" and exposure to "regulatory and contractual violations." [Doc. 4 at 2-3, 8]; see also [Doc. 9 at 2]. To the extent that these assertions attempt to show harm independent of the Plaintiff's chargeback exposure, none of the assertions are adequately explained, let alone sufficiently established.

Accordingly, the Court concludes that the Plaintiff has failed to clearly show that he is likely to suffer irreparable harm in the absence of preliminary relief. Because the Plaintiff has failed to show a likelihood of irreparable harm, the Court need not consider the remaining Winter factors, which the Plaintiff has only cursorily addressed in his briefing. See [Doc. 4 at 6-8; Doc. 9 at 8-10]. The Plaintiff's motion for a temporary restraining order and preliminary injunction will be denied.

### O R D E R

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 4] is hereby **DENIED**.

**IT IS SO ORDERED**.      Signed: April 25, 2026

Martin Reidinger
Chief United States District Judge

10